TCA BUILDING COMPANY, Appellant,

v.

NORTHWESTERN RESOURCES COMPANY, et al., Appellees.

No. 10–94–282–CV.

Court of Appeals of Texas, Waco.

April 30, 1996.

Rehearing Overruled June 19, 1996.

G. Allen Price & Michael A. McLaughlin, Houston, for appellant.

James N. Parsons III, Parsons & Thorn, Palestine, C. Morris Davis, Don H. Magee, David B. Young, McGinnis, Lochridge & Kilgore, LLP, Austin, for appellee, Northwestern Resources Co.

Richard L. Adams & David P. Poole, Worsham, Forsythe & Wooldridge, LLP, Dallas, for appellee Texas Utilities Electric Company.

Before CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

TCA Building Company (TCA) appeals the trial court's judgment in favor of appellees Northwestern Resources Co. (NWR) and Texas Utilities Electric Company (TU Electric) on TCA's suit for declaratory judgment, fraud, and trespass. TCA raises eleven points of error: the first three address TCA's allegation that NWR's mining of lignite from a mine in which TCA possessed an interest was unlawful because a statute in effect at the time NWR executed its lease with the landowner rendered the lease void *ab initio;* in its fourth and fifth points TCA complains that the trial court erred in admitting into evidence a document created by NWR during trial because (1) it constituted an offer of settlement and (2) TCA was unfairly prejudiced by it; the sixth, seventh, and eighth points concern the factual sufficiency of the evidence on the questions of fraud, trespass, and damages, respectively; in its ninth and tenth points TCA argues (1) the trial court erred in submitting the question of NWR's defense of accord and satisfaction because there was no evidence adduced at trial in support of it and (2) the evidence is factually insufficient to support the jury's finding that NWR was entitled to the defense; and, finally, TCA contends in its eleventh point that NWR was not entitled to its estoppel defense because it was guilty of unclean hands. We affirm.

### I. PROCEDURAL AND FACTUAL BACKGROUND

This suit arises out of the execution of certain coal and lignite leases on two tracts of land located in Freestone County totalling approximately 110 acres. We will track the relevant history of the two tracts, which we will refer to collectively as the "property."

On October 12, 1972, Woodrow Laird Lahrmann (Larry) purchased the property from the Veterans Land Board (VLB). Under his purchase agreement with the VLB, title to the property was to remain with the Board until the amount owing under the agreement was paid in full. On August 11, 1978, Larry executed a ten-year lease with TU Electric to mine coal and lignite from the property.[1] Larry died six days later, and his father, Woodrow Lee Lahrmann (Woody), inherited the property.

When the August 1978 lease was executed, Texas law prohibited leases on surface estates for longer than ten years on VLB land and also outlawed the granting of lease options of any length on VLB surface estates. Act of June 15, 1977, 65th Leg., R.S., ch. 871, § 161.227, 1977 Tex.Gen.Laws 2345, 2668 (current version codified as amended at TEX. NAT.RES.CODE ANN. § 161.227 (Vernon 1993)); *see McPhail v. Texas Architectural Aggregate, Inc.,* 573 S.W.2d 893, 897 (Tex. Civ.App.—Eastland 1978, no writ).[2] On the same date TU Electric executed the ten-year lease, it also purchased, for $20, an option on the property whereby TU Electric could pay to the VLB the remaining amount of money Woody owed on the property before the ten years were over, which would then divest the VLB of ownership. By paying off the VLB in full, TU Electric would thereby activate the 35-year option the parties agreed would expire on August 11, 2013, 35 years after they executed the initial lease. The theory behind the option was that if the VLB was paid in full then section 161.227 would no longer have any application to the parties' transaction and they could then agree to a lease-term for whatever length they found mutually acceptable.

In 1982 Woody sought to invalidate the lease on the grounds that it purportedly violated section 161.227. He contended that the primary ten-year term plus the 35–year option term amounted to an impermissible 45–

---

1. In actuality, two leases were executed for the two tracts, but the leases are essentially identical and, therefore, for the sake of simplicity, we will refer to the leases collectively as a single lease.

2. The Southern District of Texas has held that section 161.227 applied only to the surface estate, not oil, gas, or mineral leases because they would be part of the mineral estate. *Wade v.*

*Texaco Trading & Transp., Inc.,* 779 F.Supp. 67, 70 (S.D.Tex.1991). Lignite may or may not be part of the surface estate. There is no evidence on this issue at trial. We will assume, therefore, that the lignite at issue in this case is part of the surface estate and that the version of section 161.227 applicable to the 1978 lease precluded leases of any longer than a ten-year term.

year term. The suit was later dismissed for want of prosecution.[3]

In 1983 Woody's debt to the VLB was paid off, and he obtained fee simple ownership of the property.

In 1986 TU Electric assigned its interests in the property to NWR. Some time after acquiring TU Electric's interests, NWR conducted an examination into the history of the lease and became concerned that the option might be invalid under section 161.227 as it existed at the time of the lease's execution. Accordingly, NWR persuaded Woody in January 1987 to sign a ratification of the August 1978 transactions.

In 1988 the ten-year lease expired by its own terms with no lignite having been produced from the property. Also in 1988, NWR took possession of the property under the lease. Woody vacated the property at or about this time and then tried to sell it to NWR. NWR, however, decided not to purchase the property.

In April 1991 Donald McLaughlin left NWR's employment and began to work for B & B Real Estate Company. Donald then joined with his brother, Michael, to buy the property from Woody through TCA, a company Michael had previously created in 1990 to build a house for investment purposes. TCA bought the property on September 20, 1991, for approximately $130,000.

Subsequent to TCA's purchase of the tracts, NWR began preparations for mining by stripping the land down to the level of possible coal production.

Within two months from the date it bought the property, TCA ordered NWR to vacate the premises. NWR maintained that the lease Woody ratified was valid and, therefore, it was entitled, pursuant to the ratified lease, to remain on the property and mine it. NWR accordingly continued to prepare the property for mining. TCA, in response, threatened NWR with a $55,000,000 lawsuit if it continued its operations.

In February 1993 NWR answered that it would bypass the property and not mine it at all if TCA did not recognize NWR's mining rights. TCA refused to confirm NWR's mining rights, so NWR bypassed the property. TCA then sued NWR for bypassing the property, alleging that by doing so TCA was deprived of the ability to conduct effective mining operations of its own.

TCA then offered to sell and deliver the unmined lignite to Houston Lighting & Power Company (HL & P), the same customer to whom NWR had agreed to sell the lignite it had mined. On October 29, 1993, HL & P accepted TCA's offer, subject to several conditions, one of which was that TCA obtain a letter of release from NWR of HL & P's exclusive requirements contract with it. HL & P had previously agreed with NWR to purchase all of the lignite it needed to operate its power plant from NWR. Therefore, HL & P needed to obtain a release from this exclusivity agreement before it could purchase any lignite from TCA.

NWR initially refused TCA's request to release HL & P from the exclusivity clause; however, on December 10, 1993, NWR filed a "Release of Exclusivity and License," designed, according to NWR, to convey to TCA all its lignite rights so that TCA could sell the lignite to HL & P or some other customer. TCA however disputed the effectiveness of the release because it did not expressly convey title to the lignite and because NWR might be entitled to royalty payments from the sale of the lignite. Following testimony to this effect at trial, NWR prepared a Supplement to the Release of Exclusivity and License and filed it on February 9, 1994. The Supplement expressly conveyed to TCA any mineral interests NWR might have in the property. NWR also offered to provide the necessary overburden and topsoil to reclaim the property, which would remedy any problems NWR's bypass of the property might have presented to anyone trying to mine the property.

---

**3.** We recognize that this assertion is contrary to TCA's concession that the option was to run for 35 years from the date of its execution, but the wording of the option clearly indicates this fact and TCA admits such in its original brief.

## II. WHETHER THE 1978 LEASE WAS VOID *AB INITIO*

■ In its first point of error TCA contends the trial court erred in concluding that the 1978 lease, although void under section 161.227, could later be ratified once the impediment of the statute had been removed. We agree with the trial court.

At the time the lease and option was executed in 1978, section 161.227 provided:

(a) No land purchased under this chapter may be leased by the purchaser for a term of more than 10 years except for oil, gas, and other minerals and as long after 10 years as minerals are produced from the land in commercial quantities.

(b) No lease may contain a provision for option or renewal of the lease or re-lease of the property for any term, and the taking of an option, renewal, or re-lease agreement on a separate instrument to take effect in the future is prohibited. A lease or instrument that contains an option, renewal, or re-lease agreement in violation of this section is expressly declared to be void.

From the language of the statute, the law appears clear that the parties' lease agreement, including both the 35-year option and the ten-year primary term, was void.

In 1981, however, section 161.227 was amended to allow for lease terms of more than ten years on VLB land as well as lease options provided that both terms combined did not exceed 40 years. Act of June 17, 1981, 67th Leg., R.S., ch. 812, § 1, 1981 Tex.Gen.Laws 3080. In 1987, NWR paid Woody $20 to ratify the lease. TCA contends the ratification was ineffective because the lease, void at the time it was executed, could never be ratified.

■ As a general rule, void contracts cannot be ratified. *Jack v. State,* 694 S.W.2d 391, 397 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *Seafarers' Welfare Plan v. George E. Light Boat Storage, Inc.,* 402 S.W.2d 231, 234 (Tex.Civ.App.—Houston 1966, writ ref'd n.r.e.); *see The Atrium v. Kenwin Shops of Crockett, Inc.,* 666 S.W.2d 315, 317 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Peniche v. Aeromexi-*

*co,* 580 S.W.2d 152, 157 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). TCA argues from this general rule that a contract void at its inception for whatever reason will always be void and incapable of ratification notwithstanding any change in the facts relevant to the parties or changes in the applicable law.

■ Texas authority is clear that this is not the case. The cases have held that, so long as the invalidating condition is removed and a valid ratification subsequently occurs, the previous void contract can be ratified. *Reserve Petroleum Co. v. Hodge,* 147 Tex. 115, 213 S.W.2d 456, 459 (1948); *Greene v. White,* 137 Tex. 361, 153 S.W.2d 575, 588 (1941); *Humble Oil & Ref. Co. v. Clark,* 126 Tex. 262, 87 S.W.2d 471, 474 (1935); *Grissom v. Anderson,* 125 Tex. 26, 79 S.W.2d 619, 622–23 (1935); *Hunt v. Robinson,* 1 Tex. 748, 755 (1847); *National Bank of Commerce v. May,* 583 S.W.2d 685, 690 (Tex.Civ.App.—Eastland 1979, writ ref'd n.r.e.); *Fenn v. Boxwell,* 312 S.W.2d 536, 545 (Tex.Civ.App.—Amarillo 1958, writ ref'd n.r.e.); *Simmons v. Clampitt Paper Co.,* 223 S.W.2d 792, 794–95 (Tex.Civ.App.—Dallas 1949, writ ref'd n.r.e.); *Glasscock v. Farmers Royalty Holding Co.,* 152 F.2d 537, 540 (5th Cir.1945) (applying Texas law); *accord Ellison v. Evergreen Cemetery,* 628 A.2d 793, 799 (N.J.Super.Ct.App.Div.1993); *Estate of Kinsey v. Janes,* 82 Ohio App.3d 822, 613 N.E.2d 686, 690 (1992). The rule was accurately and concisely stated by Professor Corbin:

It is often said that the parties to an illegal contract can not validate it by a subsequent ratification. This is quite true so long as there has been no change in the law or in the facts as would cause the bargain to be valid and enforceable if made at the time of ratification. If, however, such a change has occurred, the ratification may itself constitute an enforceable contract. Neither the making of such a bargain or its performance is any longer prohibited; and all that is now necessary is that the ratifying transaction shall itself fulfill ordinary contract requirements.

6A A. CORBIN ON CONTRACTS § 1532 at 806 (1962). The lease agreement, including both the primary ten-year term and the optional

35–year term, was void when executed in 1978 by virtue of the operation of the version of section 161.227 in effect at the time. In 1981, section 161.227 was amended in such a way that the lease agreement between TU Electric and Woody, had it been executed subsequent to the effective date of amended section 161.227, would have been enforceable. In 1987, in consideration for $20, Woody ratified the lease agreement. The only question, then, is whether the ratification constituted an enforceable contract.

The record reveals that the elements required for an enforceable contract were met in the 1987 ratification agreement. NWR obtained from Woody the authority to mine lignite and coal from the property, and Woody obtained from NWR a royalty interest in that lignite and coal produced and $20. The parties formalized their mutual agreement to the ratification in a written document they both signed on January 28, 1987. Having found the contractual elements of offer, acceptance, and consideration, we conclude the 1987 ratification is a valid contract which rendered the 1978 lease agreement enforceable.

TCA raises the issue of whether the 1987 ratification agreement is effective only subsequent to its execution date or whether it relates back to August 11, 1978, the date of the original lease agreement. The ratification is certainly valid at least from January 28, 1987, and, under the facts of this case, there is no reason for us to decide if it was effective retroactively. *Chester v. Breitling,* 88 Tex. 586, 32 S.W. 527, 529 (1895). TCA's purchase of the property from Woody occurred in 1991, four years after the ratification agreement. Accordingly, it is sufficient to hold that the ratification agreement was effective from the date of its execution.

■ TCA also argues that any ratification of the 1978 lease cannot be effective because subsequent changes in law do not have the effect of validating previously illegal contracts, and it cites several cases in support of its argument. *See Fitzsimons v. Eagle Brewing Co.,* 107 F.2d 712, 713–14 (3rd Cir. 1939); *Branch v. Mobil Oil Corp.,* 772 F.Supp. 570, 571 (W.D.Okla.1991); *Sabine Corp. v. ONG Western, Inc.,* 725 F.Supp.

1157, 1183 (W.D.Okla.1989); *Gugliotta v. Evans & Co., Inc.,* 690 F.Supp. 144, 148 (E.D.N.Y.1988); *Toll v. Friedman,* 272 A.D. 587, 74 N.Y.S.2d 176, 177 (1947); *Estate of Kinsey,* 613 N.E.2d at 690; *State v. Braun,* 100 Wis.2d 77, 301 N.W.2d 180, 191 n. 10 (1981) (Abrahamson, J., dissenting); *Marcomo Stevedoring Corp. v. Nathanson,* 202 Misc. 154, 108 N.Y.S.2d 789, 792–93 (N.Y.Sup.Ct.1951). We decline, however, to address the issue of whether the mere change in law will automatically ratify a previously illegal contract; instead, we rest our holding solely on the ground that the express ratification of a previously illegal agreement subsequent to a change in the law that removes the illegality of the agreement validates the original agreement.

■ TCA further argues that the 1978 lease agreement could not be ratified because section 161.227 expressly deemed agreements in violation of its requirements void. TCA asserts that there is a difference between an illegal contract and a void contract. Illegal contracts, however, are void. *Paragon Oil Syndicate v. Rhoades Drilling Co.,* 115 Tex. 149, 277 S.W. 1036, 1037 (1925); *Texas Life, Accident, Health and Hosp. Serv. Ins. Guar. Ass'n v. Lorena State Bank,* 911 S.W.2d 842, 844 (Tex.App.—Austin 1995, n.w.h.); *Rogers v. Wolfson,* 763 S.W.2d 922, 924 (Tex.App.—Dallas 1989, writ denied); *Ben E. Keith Co. v. Lisle Todd Leasing, Inc.,* 734 S.W.2d 725, 727 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); *Jack,* 694 S.W.2d at 397; *Peniche,* 580 S.W.2d at 157. If an illegal contract may properly be ratified subsequent to a change in law that removes the invalidating quality of the law as it previously stood, then the rule is the same for void contracts. TCA's argument is without merit. Its first point is overruled.

In its second point of error TCA argues the trial court had no discretion to rule on March 11, 1994, that the 1978 lease could be ratified when it had earlier ruled on March 12, 1993, on a summary judgment motion that the 1978 lease was void when executed. Our holding in TCA's first point indicates that the 1978 lease, although void when executed, could subsequently be ratified under the facts of this case. Therefore, there is no

inconsistency between the trial court's ruling on the motion for summary judgment and its final judgment. TCA's second point is overruled.

■ In its third point, TCA contends the trial court erred in denying its request to declare void the 1986 assignment of the 1978 option from TU Electric to NWR. It contends that because the option was void when executed in 1978, it constituted a nullity and a nullity could not be assigned. *Jack,* 694 S.W.2d at 397. Our holding under TCA's first point of error, however, reveals that the 1978 option was not a nullity. It was capable of being ratified once the law changed in 1981 to permit the type of lease agreement that was agreed to by Larry and TU Electric in 1978. We overrule TCA's third point.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE SUPPLEMENT

■ TCA in its fourth point contests the trial court's ruling that the Supplement to the Release of Exclusivity and License (hereafter the supplement) filed on February 9, 1994, was admissible. It contends the supplement was tantamount to a settlement offer and therefore inadmissible under TEX. R.CIV.EVID. 408.[4]

■ Offers made to settle disputed claims are not admissible to prove liability. TEX.R.CIV.EVID. 408; *Ford Motor Co. v. Leggat,* 904 S.W.2d 643, 649 (Tex.1995) (orig. proceeding); *Tatum v. Progressive Polymers, Inc.,* 881 S.W.2d 835, 837 (Tex.App.— Tyler 1994, no writ). Rule 408, however, does not bar the admission of settlement offers when offered for a purpose other than that of proving the liability for or the invalidity of a claim or its amount. TEX.R.CIV.EVID. 408; *Barrett v. United States Brass Corp.,* 864 S.W.2d 606, 633 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds sub nom*

*Amstadt v. United States Brass Corp.,* 39 Tex.Sup.Ct.J. 351, 919 S.W.2d 644 (1996). The offers may be admissible for another purpose, such as to demonstrate bias or prejudice. TEX.R.CIV.EVID. 408; *General Motors Corp. v. Saenz,* 829 S.W.2d 230, 243 (Tex. App.—Corpus Christi 1991), *rev'd on other grounds,* 873 S.W.2d 353 (Tex.1993); *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259, 269 (Tex.App.—Houston [1st Dist.] 1991), *rev'd on other grounds,* 903 S.W.2d 315 (1994); *Ochs v. Martinez,* 789 S.W.2d 949, 959-60 (Tex.App.—San Antonio 1990, writ denied) (on rehearing). The burden is on the party objecting to the evidence to show that it was offered as part of settlement negotiations and not offered for another purpose. *Haney v. Purcell Co., Inc.,* 796 S.W.2d 782, 790 (Tex.App.—Houston [1st Dist.] 1990, writ denied). In deciding whether the evidence is being impermissibly offered as evidence of a settlement offer or whether it is being offered for some other valid reason, the trial court may properly exercise its discretion. *Tatum,* 881 S.W.2d at 837. Only when the trial court abuses its discretion will its ruling be disturbed on appeal. *See id.*

TCA's argument begins with the language of the supplement, itself, which reads, in part, "This waiver is given to help settle the dispute that has arisen between T.C.A. and Northwestern[.]" Notwithstanding TCA's arguments to the contrary, there is evidence in the record that NWR offered the supplement for a purpose other than to settle the parties' disputes. On December 9, 1993, NWR filed an instrument entitled "Release of Exclusivity and License" (hereafter the release) through which NWR attempted to convey its interest in the minerals in and under the property to TCA. TCA, however, upon learning of the existence of the release, hired an expert in oil and gas law to deter-

---

4. TEX.R.CIV.EVID. 408 reads:
   Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for, or invalidity of, the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admis-

sible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

mine its validity. The expert, Johnny Johnson, opined that the release was ineffective to convey NWR's lease interest in the property.[5] According to NWR, it filed the release to allow TCA to mine the property and sell the lignite to HL & P, and it filed the supplement to further clarify what it contended was the meaning of the release. Indeed, TCA admits in its brief that this was one of the two reasons why NWR offered the supplement into evidence.[6] NWR undeniably was within its rights in attempting to demonstrate that TCA suffered no damages as a result of NWR's actions. Finding evidence in the record to support the trial court's ruling, we conclude the court did not err in admitting the supplement into evidence. *Tatum*, 881 S.W.2d at 837–38. TCA's fourth point is overruled.

■ In its fifth point TCA contends that the supplement, even if admissible under Rule 408, was nevertheless inadmissible under Rule 403 of the Rules of Civil Evidence because its probative value was substantially outweighed by the danger of unfair prejudice that would result from its admission. TEX. R.CIV.EVID. 403. TCA maintains that it suffered extreme prejudice for two reasons: (1) because the supplement was created after TCA had rested its case-in-chief, thereby depriving it of a sufficient opportunity to present evidence in opposition to it and (2) because NWR admitted the supplement was cumulative evidence. We disagree.

■ Rule 403 requires the trial court to conduct a balancing test to determine whether or not the proffered evidence is admissible. *John Deere Co. v. May*, 773 S.W.2d 369, 373 (Tex.App.—Waco 1989, writ denied). The trial court has wide latitude to exclude evidence if it creates undue prejudice, distracts the jury from the main issue or issues, if it consumes an undue amount of time, or if it unfairly surprises the proponent's adversary. *Charter Medical Corp. v. Miller*, 605 S.W.2d 943, 953 (Tex.Civ.App.—

Dallas 1980, writ ref'd n.r.e.). The trial court's ruling will be upheld absent an abuse of discretion. *Sims v. Brackett*, 885 S.W.2d 450, 453 (Tex.App.—Corpus Christi 1994, writ denied); *New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp.*, 872 S.W.2d 303, 310 (Tex.App.—Austin 1994, no writ).

Considering its first contention, TCA was not deprived of an opportunity to respond to the supplement. Once NWR let it be known that it wished to enter the supplement into evidence, TCA requested permission from the trial court to reopen its case and question one of its expert witnesses, Mike Kolin, on it. The request was granted, at least insofar as to permit TCA to question Kolin at some point. TCA, however, decided two days later not to put Kolin back on the stand to testify against the supplement because Kolin had apparently stated, according to TCA, that he would require 90 to 100 days to study it and that the study would require a "ton" of money.

TCA waived any complaint that it was somehow unfairly surprised by the admission of the supplement. Once it learned that NWR wished to offer the supplement into evidence, TCA requested permission from the trial court to recall one of its witnesses to respond to it. TCA then learned that it would cost a lot of money and would take a lot of time to perform a sufficient analysis. TCA's complaint about the cost of the preparation is without merit because TCA would have had to bear the cost at any time for its expert to study the document. Regarding the amount of time Kolin would require to analyze the supplement, TCA waived any complaint in failing to ask the trial court for a continuance, or some other similar relief, until Kolin could complete the task. *See F & S Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104, 1108 (5th Cir.1981); Jack B. Weinstein & Margaret A. Berger, 1 WEINSTEIN'S EVIDENCE, UNITED STATES RULES, § 403[01] (1993). Although it may appear

---

5. Mr. Johnson understood from the release that NWR intended for TCA to be able to mine lignite from the property but that TCA would then still be required to pay to NWR a royalty interest on the mined lignite.

6. TCA makes no argument that the supplement was not legally relevant to the issue of whether NWR disavowed its lease interest in the property when it executed the release; therefore, we will assume it was. *See* TEX.R.CIV.EVID. 401.

that there was no possible way by which the trial court would grant such a long continuance, the matter was not brought before the court. A hearing could have been conducted to challenge Kolin on his estimation for the length of time he claimed to require; perhaps he might have been able to produce the study in a more abbreviated fashion that would have been acceptable to all of the parties. Because the request was never made, the trial court did not have an opportunity to undertake this examination. Moreover, by failing to make the request, TCA could be considered to have abandoned its hope of being able to adequately respond to the supplement in favor of hiding behind an evidentiary rule that could later be exploited for a reversal if the judgment proved to be unfavorable. *Clark v. Pennsylvania R.R. Co.*, 328 F.2d 591, 593 (2nd Cir.), *cert. denied,* 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); *see Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner, and Smith, Inc.*, 805 F.2d 49, 53–54 (2nd Cir.1986); *Millers' Nat'l Ins. Co., Chicago, Illinois v. Wichita Flour Mills Co.*, 257 F.2d 93, 98–99 (10th Cir.1958). We therefore conclude that TCA waived any complaint it may have had in being surprised by the supplement by failing to request a continuance or other appropriate relief.

Similarly, there is no merit to TCA's argument that the evidence was prejudicial because NWR admitted that it was merely cumulative. The essence of NWR's comment was that there was nothing new to the supplement that was not in the release. NWR's position has always been that it offered the supplement solely to clarify the release, not to add anything to it or change its terms. On the other hand, TCA argued at length to the trial court that the legal effect of the supplement was different than the legal effect of the release. Through its expert, Johnson, TCA contended that the release accomplished an incomplete conveyance of NWR's mineral interests in the property to TCA. It then argued that the supplement constituted a complete conveyance of the estate. If the supplement was truly cumulative of the release, TCA would have not made this

argument. Finding both arguments to be without merit, we overrule TCA's fifth point.

## IV. WHETHER THE EVIDENCE WAS FACTUALLY SUFFICIENT ON THE ISSUES OF FRAUD, TRESPASS, AND DAMAGES

▪ In its sixth point of error, TCA asserts the jury's finding on the fraud issue is against the great weight and preponderance of the evidence. The substance of TCA's fraud cause of action involves the representations NWR made to Woody in the ratification agreement. Deposition testimony from Woody was offered at trial that had he known the lease was invalid at the time NWR asked him to sign the ratification agreement, he would have refused to sign it.[7] NWR, according to TCA, intentionally deceived Woody by stating in the agreement that "the option and all rights and privileges therein" were "owned and held" by NWR. TCA contends that this assertion obviously was not true before the ratification was signed because section 161.227 rendered the 1978 lease agreement void and NWR knew that the agreement was void because it had previously received a lawyer's title opinion to this effect.

▪ In reviewing a factual sufficiency point, the court of appeals must weigh all of the evidence in the record, both favorable and unfavorable to the judgment. *Ortiz v. Jones,* 39 Tex.Sup.Ct.J. 294, 295, 917 S.W.2d 770 (1996). The findings of the trier of fact may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See id.*

▪ TCA's contention is without merit. The record reveals that in 1982 a lawsuit was filed by an attorney named Jack N. Webernick on the behalf of Woody and others seeking to invalidate the lease agreement on the ground that it was void under section 161.227. The suit was later dismissed for want of prosecution. As TCA asserts in its brief, one of the elements of fraud is that the putative victim reasonably relied upon the representation or representations of the defendant. *Sears, Roebuck & Co. v. Meadows,*

---

7. Woody died prior to trial.

877 S.W.2d 281, 282 (Tex.1994). TCA submits that Woody reasonably relied upon NWR's statement in the ratification agreement that it owned the rights to the lease. Woody, however, knew that this assertion was questionable when he filed his suit in 1982. *Pentikis v. Texas Electric Service Co.*, 470 S.W.2d 387, 390 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.) (a party to a lawsuit is charged with knowledge, as a matter of law, of all steps taken and claims made in the suit).[8] Therefore, the evidence supports the jury's implicit finding that Woody did not reasonably rely upon NWR's statements.[9] TCA's sixth point of error is overruled.[10]

In its seventh point TCA contends the jury's findings on its trespass claim are also factually insufficient. In our disposition of TCA's first three points of error, however, we determined that, due to the 1987 ratification agreement, NWR's 1978 lease was valid. Because the 1978 lease was valid, NWR had a right to mine the lignite. Therefore, it was entitled to be on the property. TCA's seventh point is overruled.

In its eighth point, TCA argues the evidence is insufficient to support the jury's finding that NWR did not reduce the value of the property by its mining operations on the surrounding tracts. TCA identifies a sole piece of evidence in support of its argument—an admission by NWR that "by May 1, 1993, the mining and reclamation operations [conducted by NWR would] bypass the [property] to the point that it is not economically feasible to produce lignite from [it]."

Michael McLaughlin testified that TCA expected to receive a return of $300,000 to $400,000 on its $130,000 investment in the property. TCA later agreed with HL & P to sell the lignite in the property to them for approximately $34 million. Without further argument and citation to the record from TCA on the issue, we are unable to find the facts insufficient to support the jury's finding of no reduction in the value of the property. *See* TEX.R.APP.P. 74(f). Therefore, TCA's eighth point is overruled.

## V. WHETHER THERE WAS ERROR IN THE ACCORD AND SATISFACTION DEFENSE

TCA in its ninth and tenth points of error complains (1) that the trial court should not have submitted the accord and satisfaction defense to the jury and (2) the evidence is insufficient to support the jury's acceptance of NWR's accord and satisfaction affirmative defense. We need not address these issues, however, because TCA has failed on each of its causes of action. Therefore, any error in the accord and satisfaction finding would be harmless. TEX.R.APP.P. 81(b)(1); *Westbrook v. Texas & P. Ry. Co.*, 203 S.W.2d 279, 286–87 (Tex.Civ.App.—Eastland 1947, writ ref'd

---

8. The relevant portion of Woody's petition reads as follows:

... Plaintiffs allege that Defendants are guilty of false, misleading or deceptive facts, and misrepresentations in that the Defendants, in the year 1978, while securing leases for the Defendants, had the Plaintiffs enter into an option for [a] coal and lignite lease ... which purports to give an option to the Defendants for a period of time after the primary term of a lease of ten (10) years. At the time that said options were executed in 1978, no land purchased by a Veteran purchaser which was leased to a 3rd party could exceed 10 years, and therefore all options for a period after 10 years were void as far as Veteran Land Board regulations were concerned.... As an alternative relief, Plaintiffs allege that the [options] should be terminated by the Court ... due to the fact that they were not valid ... at the time said options were executed in 1978.

9. The record also indicates that Webernick never discussed the suit with Woody and that Woody was unaware that the suit was ever filed. However, on June 21, 1993, Woody signed a Motion to Withdraw filed by Webernick wherein Webernick claimed that he was an attorney for Woody in the above-mentioned cause to invalidate the 1978 lease. Moreover, evidence was presented from Webernick that he believed he had an attorney-client relationship with Woody. We conclude that the jury's implicit finding that Woody and Webernick had an attorney-client relationship is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

10. In its surrebuttal brief filed postsubmission, TCA appears to raise for this first time the issue that TU Electric allegedly defrauded Larry when the lease agreement was first executed in 1978. TCA, however, cites to no point in the record where any evidence was adduced that TU Electric defrauded Larry; therefore, we will not consider this contention on appeal. TEX.R.APP.P. 74(f).

n.r.e.). TCA's ninth and tenth points are overruled.

## VI. WHETHER NWR WAS GUILTY OF UNCLEAN HANDS

TCA in its eleventh point argues that NWR was not entitled to the equitable defense of estoppel because the evidence conclusively established that NWR had "unclean hands." Similar to our rejection of TCA's ninth and tenth points, however, we need not consider this point of error because TCA failed on each of its causes of action; therefore, any error would be harmless. TEX. R.APP.P. 81(b)(1); *Estes v. Reding*, 398 S.W.2d 148, 150 (Tex.Civ.App.—El Paso 1965, writ ref'd n.r.e.). TCA's eleventh point is overruled. The judgment is affirmed.