CHICAGO BRIDGE & IRON COMPANY *vs.* CERTAIN
UNDERWRITERS AT LLOYD'S, LONDON, & another.[1]

No. 01-P-645.

Middlesex. February 6, 2003. - October 17, 2003.

Present: RAPOZA, SMITH, & GREEN, JJ.

*Contract,* Insurance, Indemnity, Construction of contract. *Hazardous Waste.*
*Insurance,* Coverage, Construction of policy, Excess Liability Insurance,
Property damage, Insurer's obligation to defend, Notice. *Damages,* Hazard-
ous waste contamination, Apportionment, Attorney's fees, Interest. *Joint*
*and Several Obligation. Environment,* Environmental cleanup costs. *Notice,*
Insurance claim.

In an action under Illinois law seeking to establish an insurer's duty to defend
and indemnify, the judge, in determining the manner in which the insured's
losses (environmental cleanup and litigation expenses resulting from
contamination occurring in several sites over a period of fifty years) would
be allocated between the insured and its insurer (which had provided
excess liability insurance for only nine years during the relevant period),
did not err in declining to apportion liability in accordance with the propor-
tion the insurer's policy period bore to the total period during which the
contamination occurred, and in concluding that the insurer was liable, to
the extent of its policy limits, for all losses incurred by the insured, where,
under the clear language of the policy, coverage was triggered by the fact
that some contamination took place during the policy period and made no
express reference to pro rata allocation of damages for the resulting loss,
and where the circumstances did not permit the application of equitable
considerations to serve as a basis for apportioning the damages. [653-661]
In an insured's successful action seeking indemnification from its insurer for
expenses incurred in environmental damages litigation (which resolved the
insured's liability as to eighteen sites, only four of which had resulted in
claims against the insured), the defendants failed to demonstrate that the
insured's recovery should be decreased either by subtracting certain
amounts for self-insured retention or by reducing the costs and attorney's
fees awarded [661-663]; however, this court remanded the matter to the
Superior Court for calculation of prejudgment interest for the litigation
expenses paid by the insured as of the date it filed the indemnification ac-
tion, and thereafter as subsequent expenses were paid [665-668].
In an action under Illinois law seeking to establish an insurer's duty to defend
and indemnify the insured for environmental cleanup and litigation

---

[1]Certain London Market Insurance Companies.

expenses resulting from contamination occurring in several sites, the judge properly found that the insured complied, or that the insurer waived compliance, with the policy's notice provisions with respect to two sites. [663-665]

In an action seeking to establish an insurer's duty to defend and indemnify the insured for environmental cleanup and litigation expenses, the insured failed to demonstrate that it was entitled to interest on certain settlement funds. [668]

CIVIL ACTION commenced in the Superior Court Department on December 28, 1994.

The case was heard by *Catherine A. White*, J.

*John T. Montgomery* (*John C. Demers & Neal M. Glazer* with him) for the defendants.

*Martin C. Pentz* (*David L. Ferrera* with him) for the plaintiff.

*John D. Shugrue & Paul Walker-Bright*, of Illinois, for Kraft Foods North America, Inc., & another, amici curiae, submitted a brief.

*Laura A. Foggan & John C. Yang*, of the District of Columbia, *& Richard J. Riley* for Insurance Environmental Litigation Association, amicus curiae, submitted a brief.

RAPOZA, J. The defendant insurers, Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies (collectively, London), appeal from a Superior Court judgment requiring London to indemnify the plaintiff insured, Chicago Bridge & Iron Company (CBI), for environmental cleanup and litigation expenses in connection with a lumber company's processing operation, which contaminated a number of sites across the country with creosote over a period of some fifty years. London contends, in essence, that its liability for indemnification should be calculated in accordance with the proportion its policy period bears to the total period during which the contamination occurred.

CBI was at one time a minority shareholder in American Lumber & Treating Company (ALT) and in that capacity was identified by the Environmental Protection Agency (EPA) as potentially responsible for the environmental damages from ALT's activities. Between 1961 and 1970, London had issued policies to CBI providing excess insurance coverage for losses

due to environmental contamination. The property damage at the sites where ALT once operated its facilities began in the early 1940's and continued into the 1990's.

CBI brought this action when London denied coverage for ALT-related losses at four contaminated sites. Following a jury-waived trial, a Superior Court judge found London liable for CBI's indemnification and awarded CBI $4,678,322.24, plus prejudgment interest of $1,030,466.72, for CBI's losses over and above CBI's self-insured retention (SIR) of $100,000 at each of the four sites.

The paramount issue on appeal is the manner in which CBI's losses, which derive from contamination spanning some fifty years, should be allocated between CBI and London. There is no dispute that the property damage here could not, as a practical matter, be assigned to any particular moment in time. Cases such as this, with multiple sites, multiple policies, and long-term environmental damage, raise important questions regarding when insurance coverage under a given policy is implicated, and to what extent. Here, we view the issue through the prism of Illinois law, another Superior Court judge having determined that the law of that State applies. Nevertheless, our analysis is not inconsistent with our treatment of similar matters in *Rubenstein* v. *Royal Ins. Co. of America*, 44 Mass. App. Ct. 842, 852-853 (1998), *S.C.*, 429 Mass. 355 (1999),[2] decided under Massachusetts law. In this case, we review the relevant considerations further.

In response to the parties' motions in limine, a Superior Court judge ruled before trial that, pursuant to Illinois law and the language of the policy, London, if held liable, would be required to indemnify CBI for the entire amount of losses it incurred as a result of the contamination. This included CBI's losses from contamination occurring prior to issuance of the 1961 London policy, as well as those losses occurring after the policy was no longer in effect. London maintains that it should be liable for only a portion of those damages. Also at issue on appeal are the

---

[2]In *Rubenstein*, the Supreme Judicial Court granted further appellate review solely on the issue of attorneys' fees to the insured, and remanded the matter for the award of such fees. Our courts have not otherwise addressed the primary issue involved here.

trial judge's rulings with respect to notice and, on cross appeal, prejudgment interest.[3]

I. *Background.* We summarize the facts from the trial judge's very thorough July 16, 2000, findings of fact, rulings of law and order for judgment, which we supplement from undisputed facts contained in the record, here and in our discussion of the issues. CBI's potential liability for environmental cleanup of the former ALT sites stemmed from its status as an ALT minority shareholder in the years 1934 to 1954. Of the eighteen facilities once operated by ALT, eight had either closed or been sold by 1954, when CBI exchanged its interest in ALT for stock in Koppers Company, Inc. (Koppers), which at that time assumed ALT's assets and liabilities.

This litigation sought indemnification from London for CBI's losses in connection with four ALT sites:

A. *The Westborough site.* In 1984, the EPA identified environmental contamination at a site in Westborough, Massachusetts, which had been owned by ALT from 1936 to 1946. In May, 1985, EPA notified CBI that it was designated a potentially responsible party (PRP) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq. (1995), a consequence of CBI's ownership interest in ALT at a time when at least some of the pollution likely occurred.[4] Subsequently, CBI representatives attended a June, 1985, meeting with other PRPs, including Koppers and Aluminum Company of America (ALCOA); ALCOA had also been an ALT minority shareholder between 1934 and 1954. A tentative settlement proposal reached at that time envisioned Koppers conducting the cleanup and other PRPs contributing a percentage of the costs.

On July 3, 1985, CBI wrote to its insurance agent, Marsh & McLennan Agency, Inc., and forwarded information regarding the proposed cleanup and costs for the Westborough site. Shortly

---

[3]We acknowledge the amicus briefs filed by Kraft Foods North America, Inc., and Northern Illinois Gas Company, and by the Insurance Environmental Litigation Association.

[4]Pursuant to 42 U.S.C. § 9607(a)(1)-(4), certain categories of "covered persons" are identified as jointly and severally liable as responsible parties for damages resulting from contamination at an identified site.

after, on August 5, 1985, CBI instructed Marsh & McLennan to "give notice"[5] of the Westborough site to the various insurers that had issued excess policies to CBI covering the years 1956 to 1982.[6] Marsh & McLennan then sent an August 15, 1985, letter to Price Forbes, Ltd. (Price Forbes), London's insurance broker designated to receive CBI's claims, placing it "on notice" of the Westborough "Superfund Site." The letter to Price Forbes included the July 3, 1985, CBI letter to Marsh & McLennan, setting out the relationship of CBI to ALT and providing detailed information about the site itself. A response from Price Forbes arrived by telex on January 22, 1986, which included the following:

> "As first policy applicable incepts 19 April 1956, it would appear that at no time did underwriters insure American Lumber and fail to see where policies would respond. Await your comments."

On August 21, 1986, CBI prepared a status report on the Westborough site and CBI's financial contribution to the cleanup, which Marsh & McLennan forwarded to Price Forbes. London responded on November 7, 1986, with a reservation of rights letter. Over the next year, Price Forbes sent three subsequent telexes to Marsh & McLennan seeking CBI's response to the original January 22, 1986, telex. CBI continued to send Marsh & McLennan status reports for the Westborough site, and in June, 1987, CBI's legal department sent Marsh & McLennan information concerning other contaminated ALT sites.

During this same period, CBI reached a settlement agreement with Koppers, pursuant to which CBI's contribution to the Westborough cleanup was capped at $500,000. Also included in the settlement was Koppers's agreement to indemnify CBI for cleanup costs at a total of eleven (including the Westborough

---

[5]The trial judge observed that the CBI letter did not explicitly instruct Marsh & McLennan to notify insurers that CBI would seek indemnification for its costs.

[6]The record indicates that CBI purchased numerous excess policies from various insurance companies beginning in 1956 and onward, although the parties do not discuss the scope of coverage provided. London is the sole defendant in this case.

facility) former ALT sites (the 1986 indemnity agreement). In November, 1987, CBI joined in a consent decree with the EPA and Koppers, approved by the United States District Court for the District of Massachusetts, whereby CBI paid $500,000 towards the Westborough site cleanup. Between 1984 and 1988, CBI's legal expenses in connection with the Westborough site totaled $105,184.

B. *The Weed site.* ALT had also operated a facility in Weed, California, which it sold in 1954. In 1990, CBI received notification that it was designated a PRP for the Weed site. Koppers, now known as Beazer East, Inc. (Beazer), and ALCOA were also designated. CBI instructed Marsh & McLennan to notify the excess insurers of the Weed claim. On November 2, 1990, Price Forbes responded, requesting to be kept informed regarding the Weed site, and asking whether CBI had withdrawn its claim for the Westborough site "in view of the lack of coverage per our telexes."

In 1991, CBI, Beazer, and ALCOA agreed to share the Weed cleanup costs equally. The cleanup was eventually conducted by International Paper Company and J.H. Baxter Company, with CBI, Beazer, and ALCOA contributing, dividing the costs in accordance with their 1991 agreement. In 1990, 1991, and 1992, CBI's status reports on the Weed site were forwarded to Price Forbes. On October 23, 1991, an attorney representing London wrote to CBI, acknowledging receipt of the Weed claim and issuing a reservation of rights. As of 1991, CBI's legal expenses in connection with the Weed site were $165,249 and its first installment for payment of cleanup costs was $266,666.

C. *The International Paper suit.* In 1992, International Paper Company filed a law suit against CBI, Beazer, and ALCOA to recover cleanup costs for two former ALT sites: the DeRidder, Louisiana, site and the Joplin, Missouri, site. In January, 1993, Marsh & McLennan notified Price Forbes of the litigation. London issued a reservation of rights for these sites as well. The action settled in 1994, CBI contributing $1,446,667 to the settlement and incurring legal expenses of $505,425.

D. *The Pittsburgh litigation.* When a former ALT site in Gainesville, Florida, was identified in 1990 as being in need of remediation, Beazer asked CBI to take part in the negotiations,

claiming that the 1986 indemnity agreement executed by Beazer's predecessor, Koppers, in favor of CBI and ALCOA, was null and void. ALCOA filed suit against Beazer in the Western District of Pennsylvania (hence, the "Pittsburgh litigation") in 1991. Soon after, CBI filed an action against Beazer in California, seeking reimbursement for the Weed expenses, enforcement of the 1986 indemnity agreement, and a declaration that CBI was not liable for the environmental contamination at any of the former ALT sites. Upon Beazer's motion, CBI's California action was consolidated with the Pittsburgh litigation.

Beazer eventually conceded that the 1986 indemnity agreement was valid, and in March, 1992, the court in the Pittsburgh litigation entered an order to that effect.[7] Notwithstanding Beazer's concession as to the validity of the 1986 agreement, both parties still disputed whether CBI was responsible to pay any amount for environmental damage at the eighteen ALT sites, whether by virtue of its part ownership of ALT or as an operator of the ALT facilities from 1934 to 1954. The case eventually went to trial on the operator theory of liability. Following a bench trial in 1996, the Federal District Court judge found that CBI was not an "operator" under CERCLA, and that only Beazer, as successor to ALT, was liable for the remedial costs for all of the ALT sites. Final judgment was entered on September 2, 1997, after the judgment was affirmed on appeal. *Aluminum Co. of America* v. *Beazer East, Inc.*, 124 F.3d 551 (3d Cir. 1997).

As a result of the judgment in the Pittsburgh litigation, Beazer reimbursed CBI $1,446,667, the amount CBI had contributed to settle the International Paper litigation over the Joplin and DeRidder sites (see discussion, *supra*), and $266,666, in connection with the Weed site. CBI's litigation expenses for the Pittsburgh litigation totaled $3,802,462.84.

II. *This litigation.* CBI instituted this action on December 28, 1994, to recover from London amounts CBI had expended on

---

[7]Under that agreement, CBI's liability was capped at $500,000 for each of the eleven sites covered by the agreement; Beazer, as Koppers's successor, was required under the agreement to indemnify CBI for cleanup costs over that amount.

litigation and cleanup costs at the Westborough, Weed, DeRidder, and Joplin sites. As noted, the motion judge, ruling on the parties' motions in limine, determined before trial that, should London be required to indemnify CBI for costs associated with the four ALT sites, London would be jointly and severally liable for all of CBI's losses, as defined in the policy and to the extent of the policy limits, rather than only for those costs attributable, proportionately, to the 1961 to 1970 period during which CBI maintained the London policies.

The trial itself, before a second Superior Court judge, addressed allocation of the damages with respect to the various ALT sites, reasonableness of the litigation expenses, CBI's compliance with the policy's notice requirements, prejudgment interest, and interest for CBI's loss of the use of settlement funds. CBI prevailed on the merits, the trial judge finding the amount due under the London policies, after subtracting the SIRs for four occurrences, calculated as follows: (1) for the Westborough site, $505,184.39 (which included CBI's contribution to remedial costs as well as legal expenses); and (2) for the Weed, Joplin, and DeRidder sites, $4,173,137.85 (consisting only of litigation expenses for the International Paper suit and the Pittsburgh litigation, since, as a result of the Pittsburgh litigation, Beazer had already reimbursed CBI for the cleanup costs at those three sites). The judge awarded prejudgment interest, though not to the extent sought by CBI, for the Pittsburgh litigation costs and denied CBI's claim for interest for the use of money advanced in settlement that Beazer had subsequently repaid.

III. *Issues on appeal.* A. *Allocation of damages.* In ruling on the parties' motions in limine, the motion judge was faced with the challenge of determining how CBI's liability for damages, resulting from roughly fifty years of continuing environmental contamination at the four ALT sites, would be allocated between CBI and London. London argued that it should be required to indemnify CBI only for London's proportionate share of CBI's expenses corresponding to London's policy periods, or what is referred to as pro rata or "time on the risk" allocation of the loss. Under this theory, London would be liable for its proportionate share of CBI's total expenses, based on the

London policies issued in the nine years from 1961 to 1970, or about eighteen percent of the expenses, while CBI would be liable for approximately eighty-two percent — its proportionate share of periods during which it carried no insurance covering the loss. CBI argued that London, in accordance with its policy, was liable for all sums incurred by CBI as a result of the contamination without regard to the period in which the contamination occurred.

The motion judge, relying principally on the policy language, determined that, because at least some of the property damage at the four ALT sites occurred at a time when CBI was insured by London, London was required to indemnify CBI for all of its losses from the contamination, up to its policy limits. As she aptly observed, nothing in the policy limited London's liability to only those damages occurring within the policy period. Rather, London's duty to provide coverage was invoked or "triggered" by the very fact that some damage took place while CBI was insured by a London policy.[8] The judge further concluded, again from the policy language, that London's liability included the years preceding the first 1961 policy period, and also extended to the years subsequent to the policy period. Accordingly, she determined that London was liable, to the extent of the policy limits, for CBI's losses relating to the four ALT sites beginning in the early 1940's.

The judge's analysis was well-reasoned and, in our view, correct. We begin with the language of the policy. See, e.g., *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 118 Ill. 2d 23, 56-57 (1987).[9] The policy makes no express reference to pro rata allocation of damages for a loss of this nature. London does not contend otherwise, but argues that Illinois courts have interpreted similar policy language to so provide.

London contracted to indemnify CBI for "all sums which the Assured shall be obligated to pay by reason of the liability . . .

---

[8] "[T]he insurable event which gives rise to the insurer's obligation to provide coverage" is also referred to as "trigger of coverage." *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 118 Ill. 2d 23, 44 (1987).

[9] Contrary to London's assertion at oral argument, we find no indication in Illinois environmental contamination cases that we should begin our analysis other than with the policy itself.

imposed upon the Assured by law . . . ," as more particularly defined in the policy. The following policy terms establish when London's obligation to provide coverage arose and what expenses were covered. The policy provides that the insurer's obligation to cover a loss is triggered by an "occurrence," defined as

> "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

We read this provision to mean, as a matter of basic syntax, that London's obligation to indemnify a loss arose when a covered event resulted in property damage during the policy period. But the phrase "during the policy period" does not define the extent of coverage. Rather, the extent of London's coverage is delineated in the definition of "ultimate net loss," stated in the policy as

> "the total sum which the Assured . . . becomes obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder."

These clauses, by their plain language, inform us that London contracted to indemnify CBI for CBI's losses from an event at an ALT site that resulted in some property damage taking place during a policy period. Significantly for our purposes, these clauses do not limit the amount London will pay to only the property damage that occurred during a policy period. Contrary to London's assertion in its brief, property damage taking place during the policy period is what triggered London's obligation

to indemnify, but the policy did not confine the extent of coverage to the policy period in which the property damage occurred. This interpretation is supported by reference to the policy's condition C, entitled "Prior Insurance and Non Cumulation of Liability," addressing property damage occurring before and after the policy period:

> "It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

> "Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium."

As the judge observed, condition C would be superfluous had the drafter intended that damages would be allocated among insurers based on their respective time on the risk. See generally *Estate of Savage* v. *Golub*, 73 Ill. App. 3d 656, 659 (1979) (objective in construing contract is to give effect to parties' intent; "various provisions of a contract must be viewed as a whole").

In so ruling, the judge also relied on *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 118 Ill. 2d at 56-57, the sole Illinois Supreme Court case addressing the issue of how to apportion among insurers the costs from a contaminating event that results in insurable damages extending beyond or overlapping policy periods. *Zurich Ins. Co.* involved insurance coverage for bodily injury resulting from ongoing exposure to asbestos products manufactured and sold by Raymark Industries between the 1940's and the 1960's. The applicable policies, issued by several different insurers beginning in 1941, typically provided coverage for "an accident, including injurious exposure to condi-

tions, which results during the policy period, in bodily injury." "Bodily injury," in turn, was defined by the policies as "bodily injury, sickness, or disease." *Id.* at 33. The court interpreted the policies to require the insurers to provide coverage for all losses if the claimant suffered any asbestos-related bodily injury, sickness or disease during the policy period. *Id.* at 43-47, 56-57.

The policies in *Zurich Ins. Co., supra,* as the court there explained, contained no limiting language that the asbestos exposure itself occur during the policy period in order to implicate coverage for the loss; were that the case, there might have been some basis for allocating damages among insurers based on the years of the claimant's exposure. *Id.* at 56-57, citing and comparing *Insurance Co. of N. America* v. *Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir. 1980) (by their policies, insurers' obligations were triggered only by a claimant's exposure to asbestos during the policy period, so that damages were allocated among the policies based on the years of exposure). But in *Zurich Ins. Co.,* each of several insurers, required by their respective policies to provide coverage more broadly, was held jointly and severally liable for the full amount of Raymark's damages.

London attempts to reconcile the policy language here with its desired result by arguing that Illinois courts have departed from *Zurich Ins. Co.* and have adopted a different analysis in environmental contamination cases when the property damage spans more than one policy period. See, e.g., two cases from the Appellate Court's Second District, *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.,* 283 Ill. App. 3d 630 (1996); *Missouri Pac. R.R. Co.* v. *International Ins. Co.,* 288 Ill. App. 3d 69 (1997). We note at the outset that the cases upon which London relies have reached that result on the Second District's interpretation of the policies involved, so that the amount of coverage was deemed limited, by the language of those policies, to property damage that occurred during the policy period. As such, pro rata allocation in those cases derived from the Second District's particular construction of the sometimes subtle, but nonetheless pivotal, differences in the policy

language involved.[10] In contrast, the London policy's definition of "occurrence," which provides that the duty to indemnify is triggered even if only some of the property damage occurs during the policy period, provides no such basis for limiting indemnification to only those damages occurring during the policy period. Compare *Zurich Ins. Co., supra* at 56-57.

Policy language aside, London contends that, due to the sometimes monumental losses involved in environmental contamination cases, Illinois courts have come to read pro rata allocation into these policies to achieve an equitable distribution of the loss.[11] We do not discern the trend. Illinois courts recognize that it is often the case that the moment of environmental property damage cannot be pinpointed, but rather occurs over a period covered by more than one policy, thereby rendering actual allocation of damages impossible. To address this problem, the concept of an "equitable continuous trigger" has been fashioned. *United States Gypsum Co.* v. *Admiral Ins. Co.,* 268 Ill. App. 3d 598, 643-646 (1994). When the property damage occurs continuously, across policy periods, the continuous trigger approach may be employed as an equitable solution that obviates the need for an otherwise futile attempt to identify

---

[10]In *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.,* 283 Ill. App. 3d at 640, most of the policies (unlike the London policy at issue here) defined "occurrence" as "one happening or series of happenings *arising out of or resulting from one event taking place during the term of this policy"* (emphasis supplied). The Second District determined that this language required the insurers to pay only those "sums incurred during the policy period," *id.* at 642, leaving the insured responsible for periods it carried no insurance. In *Missouri Pac. R.R. Co.* v. *International Ins. Co.,* 288 Ill. App. 3d at 72, the policy defined "occurrence" as "(a) an accident, or (b) a continuous or repeated exposure to conditions which result in personal injury or property damage . . . *if such* accident or such personal injury or property damage occurs while this policy is in force" (emphasis supplied). (Note that the limiting term "if such" in the *Missouri Pacific* policy does not appear in the London policy.) The Second District held that the sums the insurer was obligated to pay were limited to those stemming from personal injuries occurring during the policy period. *Id.* at 77.

[11]London suggested at oral argument that the parties to such policies never contemplated joint and several liability for the kind of extensive damages that may arise from ongoing pollution in environmental cases. But see *Benoy Motor Sales, Inc.* v. *Universal Underwriters Ins. Co.,* 287 Ill. App. 3d 942, 948 (1997) ("A continuous exposure of pollutants is the kind of occurrence envisioned by third-party liability policies").

when the property damage occurred and, hence, which insurers bear the obligation to indemnify. *Id.* at 645-646.

Application of the continuous trigger theory, which holds all insurers on the risk at any point during the ongoing pollution process liable for indemnification to the limits of their policies, does not, in itself, dictate the manner in which the damages are apportioned. It is true, as London points out, that in *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.,* 283 Ill. App. 3d at 642, because the instance of damage could not be determined and, hence, ascribed to the corresponding policy liable for the loss at that time, the Second District utilized pro rata apportionment as "the only fair approach" to determine the amount of coverage owed by the insurers or the insured. Illinois courts are not unanimous on this point, however. Again, the two Second District Appellate Court cases upon which London relies applied pro rata allocation based on policy language that the court interpreted as permitting time-on-the-risk allocation. But the First District Appellate Court, in *Benoy Motor Sales, Inc.* v. *Universal Underwriters Ins. Co.,* 287 Ill. App. 3d 942 (1997), relied on the analysis in *Zurich Ins. Co., supra,* to impose joint and several liability on an insurer whose policies were triggered during the period in which the pollution was continuing, despite gaps in coverage.[12]

Hence, both the Illinois Supreme Court in *Zurich Ins. Co., supra* at 56-57, and a division of the intermediate appellate court in *Benoy Motor Sales, Inc., supra,* recognizing the continuous nature of the harm caused by contaminants,[13] viewed such damages as supporting the imposition of joint and several li-

---

[12]In *Benoy Motor Sales, Inc.,* the insureds' shipments of used oil, some of which occurred during policy periods and some at times when no policy was in effect, had contributed to ongoing pollution at the recipient's facility. The insurer argued that the dates of the shipments permitted damages to be apportioned according to whether a policy was in effect at the time those shipments were made. But the court concluded that it was the ongoing pollution damage, and not the shipments, that defined both the duty to indemnify and the extent of coverage. Thus, applying a continuous trigger approach, the court expressly rejected pro rata allocation and held the insurer jointly and severally liable for the entire period the pollution process was occurring. 287 Ill. App. 3d at 947-948.

[13]As we discussed, the court in *Zurich Ins. Co., supra,* rather than focusing on the single point of asbestos exposure, determined that the various insurers'

ability on any insurer on the risk. See *United States Gypsum Co.* v. *Admiral Ins. Co.*, 268 Ill. App. 3d at 644, quoting from *Sentinel Ins. Co.* v. *First Ins. Co. of Hawaii, Ltd.*, 76 Haw. 277, 298 (1994) ("Under [the continuous injury trigger] theory, property damage is deemed to have 'occurred' continuously for a fixed period, and every insurer on the risk at any time during that trigger period is jointly and severally liable to the extent of their policy limits, the entire loss being equitably allocated among the insurers").[14]

Even so, London urges us to extend the equitable principles reflected in the continuous trigger theory to override the policy language here regarding apportionment of damages, as it suggests was done in *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 283 Ill. App. 3d at 641-644. But apportionment of damages in that case was, first and foremost, a consequence of how the court interpreted the language of the policy (i.e., that coverage was only for sums incurred during the policy period), and not simply an equitable solution tailored to environmental contamination cases. *Ibid.*[15]

There is yet another reason for rejecting London's invocation of equitable considerations as a basis for apportioning the damages. London insists that the imposition of joint and several liability for CBI's damages is particularly burdensome in this instance because the damages from fifty years of environmental

obligations to provide coverage were triggered more expansively, by whether bodily injury, sickness, or disease occurred during their policy periods. Though not labeled a continuous trigger approach, the result similarly implicated the coverage obligations of more than one insurer for a given claimant's losses. See *United States Gypsum Co.* v. *Admiral Ins. Co.*, 268 Ill. App. 3d at 646 (triple trigger approach used in *Zurich* "recognizes that multiple policy periods can be triggered by the evolving nature of an illness resulting from the exposure to asbestos").

[14]Though not influencing our opinion here, we note that this analysis was also utilized in *Rubenstein* v. *Royal Ins. Co. of America*, 44 Mass. App. Ct. 842, 852-853 (1998), *S.C.*, 429 Mass. 355 (1999), where this court affirmed the trial judge's imposition of joint and several liability on an insurer, based on the continuous contamination of the subject property during the policy period.

[15]We are also mindful that the policy here was first issued by London in 1961. Our analysis is confined to the policy language before us, and so does not necessarily bear on environmental coverage disputes involving more recent policies with different wording.

contamination are disproportionate to the nine-year period that CBI actually maintained applicable insurance coverage through London. Even assuming that to be an appropriate consideration in determining an insurer's liability, equitable considerations have little bearing on the damages here and do not warrant a departure from the clear language of the policy, because the bulk of CBI's losses derived from defense costs, rather than remedial costs. CBI's need to defend the claim arose from the simple fact of contamination, some of which occurred during the policy period. Consequently, the defense costs were not expended in direct relation to the timing, duration, or degree of the contamination. We therefore think the equitable principles upon which London relies to overcome the clear policy language are not compelling in the circumstances of this case.

B. *Pittsburgh litigation expenses.* We now turn to London's appeal from certain rulings of the trial judge. The Pittsburgh litigation determined that CBI was not liable for response costs relating to any of the eighteen former ALT facilities because CBI was not an "operator" of those facilities, as defined by CERCLA. Three specific "occurrences" for which CBI had already expended funds for cleanup were implicated in that litigation: the Weed, DeRidder, and Joplin sites. In the Superior Court, the trial judge awarded CBI all of its costs and attorney's fees for the Pittsburgh litigation, deducting three SIRs of $100,000 for each of those three occurrences. She declined to subtract an additional $100,000 for each of the remaining sites for which liability was resolved, "but as to which claims have not been made."

London argues that, because the Pittsburgh litigation resolved CBI's liability for contamination at all eighteen ALT sites, CBI's recovery should be reduced proportionately, either by (a) requiring CBI to pay its SIR of $100,000 for each of the eighteen sites; or (b) by awarding CBI costs and attorney's fees for only the four sites[16] involved in the instant action, or four-eighteenths of the total Pittsburgh litigation costs awarded.

The trial judge's ruling was well-founded. We again examine

[16]The Westborough site plus the three sites involved in the Pittsburgh litigation.

the policy. The policy provided, in relevant part, that London was only liable for the ultimate net loss in excess of "$100,000 ultimate net loss in respect of each occurrence." As previously explained, the policy further provided that London was required to indemnify CBI for "ultimate net loss," defined as the total sums CBI became obligated to pay

> "by reason of . . . property damage . . . either through adjudication or compromise, and shall also include . . . expenses . . . for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder."

We read this to mean that litigation expenses were covered when CBI was obligated to pay them within the context of "claims and suits," and as a consequence of an occurrence, that is, a covered event resulting in property damage.

The judge was correct in ruling that SIRs would not be deducted for the remaining fourteen ALT sites. The record indicates that no claims or suits were raised against CBI for property damage at those sites. Under the terms of the policy, and in the absence of an actual claim against CBI for property damage at a particular site, we think it a stretch to say that CBI's litigation costs in the Pittsburgh litigation were paid as a consequence of its potential liability at the fourteen remaining ALT sites. To the contrary, the Pittsburgh litigation started as a dispute over liability for three specific ALT sites. In deciding that issue, the court made the broader legal determination of CBI's status as an "operator" under CERCLA. As the court concluded that CBI was not an operator of the ALT facilities, the Pittsburgh litigation not only relieved CBI of liability for the specific sites at issue; it had the beneficial (for CBI) side effect of determining that CBI was not liable on any of the ALT sites. Because the court would have had to determine this legal question regardless of the number of sites involved, we cannot say that CBI's litigation expenses were increased by virtue of the broad implications of the court's decision. The Pittsburgh litigation expenses, therefore, were not paid pursuant to claims or suits as a consequence of occurrences at the other fourteen

ALT sites, within the common sense meaning of the policy's definition.

Similarly, there is no basis for London's claim that CBI's award for the Pittsburgh litigation expenses should be reduced to only four-eighteenths of the total, based on the four sites for which CBI seeks indemnification in this action. London's obligation to indemnify CBI for its litigation expenses is based on the language of the policy, which required that the expenses be incurred in connection with claims against CBI. Of the eighteen sites, the Pittsburgh case directly related to only three locations involving actual claims against CBI. The fact that the Pittsburgh litigation effectively resolved CBI's liability as to all eighteen ALT sites was, as noted above, merely a beneficial side effect. It is irrelevant to the question whether, under the policy, CBI should recover its entire litigation expenses for the case actually brought, which, in any event, would have resulted in a determination of CBI's status as an "operator" under CERCLA regardless of the number of sites at issue. See discussion, *supra.*

C. *Compliance with the notice requirement.* London challenges the trial judge's findings that CBI complied, or that London waived compliance, with the policy's notice provisions with respect to CBI's claim for damages arising from the Westborough and Weed sites. The relevant portion of the policy's condition J required CBI to "make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve . . . months after the Assured shall have paid an amount of ultimate net loss in excess of the [$100,000 SIR]."

1. *The Westborough site.* The judge appropriately relied on the principle that an insurer may waive a proof of loss requirement by its conduct. See *Di Leo* v. *United States Fid. & Guar. Co.,* 50 Ill. App. 2d 183, 194-195 (1964); *Tarzian* v. *West Bend Mut. Fire Ins. Co.,* 74 Ill. App. 2d 314, 326-327 (1966). The judge found that CBI reasonably could have construed London's initial telexed reply indicating that ALT was not covered by the policies, and then London's "entire subsequent course of conduct in response to CBI's coverage claims" as a denial of coverage. On that basis, the judge ruled that compliance with

the policy's proof of loss requirement was not required. See *Stoltz* v. *National Indem. Co.*, 345 Ill. App. 495, 502 (1952).[17]

At first glance, London's initial, January 22, 1986, telex, which said, inter alia, "it would appear that at no time did underwriters insure American Lumber . . . fail to see where policies would respond. Await your comments," might be read to indicate that the matter was still open to discussion. But a review of the documentation forwarded from CBI through Marsh & McLennan to London prior to this response from London, providing detailed information about the Westborough site and the entities involved, makes clear that London was fully apprised of the grounds for CBI's claim before London sent the January 22 telex.[18] Based on the evidence, the judge's finding that CBI reasonably understood London's response as a denial of coverage was fully supported.[19]

2. *The Weed site.* The judge found that on October 23, 1991, within twelve months of CBI's reaching the $100,000 SIR at the Weed site, London's counsel wrote to CBI acknowledging notice of the Weed claim and reserving its rights. The judge therefore concluded that condition J's twelve-month notice

---

[17]Relying on *Foamcraft, Inc.* v. *First State Ins. Co.*, 238 Ill. App. 3d 791, 794 (1992), London urges us to treat compliance with the notice provision as a condition precedent to recovery. *Foamcraft*, however, involved a provision barring suit under the policy more than twelve months after discovery of an occurrence giving rise to a claim. London points to no authority that equates such a limitations clause with a notice of claim requirement for purposes of foreclosing recovery.

[18]Included in the information sent to London's broker, Price Forbes, was CBI's July 3, 1985, letter to Marsh & McLennan with attachments explaining both CBI's equity ownership in ALT from 1934 to 1954 and CBI's receipt of a notice of a motion for an order authorizing deposition in advance of suit involving the Westborough site. The motion also stated that the site had been placed on the Superfund site list as a result of creosote contamination deposited between 1928 and 1946 in the course of ALT's activities. The enclosures further explained that CBI's attorneys had attended a meeting with the EPA. Excerpts of the EPA's investigative report and feasibility study were included, with the complete report available upon request. While stating its intention to dispute liability, CBI reported that it was preparing responses to the EPA's document and information request.

[19]Since we conclude that the evidence is sufficient to support the judge's finding that London waived compliance with the policy's notice provision, we do not reach the issue whether London's reservation of rights letter constituted additional proof of London's intention to deny liability.

requirement had been satisfied. London now complains that the judge confused satisfaction of condition J, which pertains to notice of a definite claim, with condition G, which pertains to notice of an occurrence.[20]

Based on the information available to London at the time of its attorney's October 23, 1991, letter to CBI, we are satisfied that London's response constituted acknowledgment of receipt of a definite claim, rather than simply receipt of notice of an occurrence under condition G. Prior to that letter, the record shows that London had received CBI's May 10, 1990, letter to Marsh & McLennan directing it to notify insurers that CBI had been designated a PRP for the Weed site.[21] In the October 23, 1991, letter, London's attorney stated explicitly that, "[o]n behalf of [London,] we acknowledge notice of the [Weed, California,] claim." The letter also requested additional information about other insurers and confirmed that "only the Weed claim is being tendered at this time." In the context of the ongoing correspondence between the parties, we agree with the judge that London acknowledged satisfaction of condition J for the Weed site.

IV. *Issues on cross appeal.* A. *Prejudgment interest on Pittsburgh litigation expenses.* The judge awarded prejudgment interest pursuant to Illinois's interest statute, 815 Ill. Comp. Stat. Ann. 205/2 (West 1996).[22] As the judge correctly explained, under the policy London's duty to indemnify attached when

---

[20]Condition G provides: "Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy, notice shall be sent . . . as soon as practicable."

[21]In forwarding the notice to the insurers, Marsh & McLennan informed them that the Weed site was not included in CBI's indemnity agreement with Beazer. London also received CBI's November 19, 1990, status update for the Weed site, which reiterated that CBI had been named a PRP, that CBI had hired outside counsel, that CBI was having discussions with other PRPs, and that a prenegotiation meeting had been scheduled for the PRPs and the EPA. Marsh & McLennan sent Price Forbes an additional CBI status report on the Weed site on July 22, 1991, in which the Pittsburgh litigation was detailed, and in which CBI's liability for cleanup costs pursuant to an oral agreement reached between Beazer and the EPA was placed at $1.6 million.

[22]This section provides, in relevant part: "creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they

666          59 Mass. App. Ct. 646 (2003)

Chicago Bridge & Iron Company *v.* Certain Underwriters at Lloyd's, London.

CBI submitted its proof of loss and London became obligated to pay for the loss, as per condition J. See *Marcheschi* v. *Illinois Farmers Ins. Co.*, 298 Ill. App. 3d 306, 314 (1998); *Knoll Pharmaceutical Co.* v. *Automobile Ins. Co. of Hartford*, 210 F. Supp. 2d 1017, 1026 (N.D. Ill. 2002). Reasoning that the costs associated with the Pittsburgh litigation could not be fixed until final judgment was entered in that case on September 2, 1997, the judge awarded prejudgment interest on CBI's Pittsburgh litigation costs commencing on that date. On cross appeal, CBI complains that the judge applied the wrong date in determining when prejudgment interest should be calculated on CBI's Pittsburgh litigation expenses. CBI sought prejudgment interest on those costs from either the date this action was filed on December 28, 1994, or the dates that the ongoing expenses were paid, whichever came later.

In order for prejudgment interest to be awarded, the sum due under the policy must be liquidated or easily computed, see *New Hampshire Ins. Co.* v. *Hanover Ins. Co.*, 296 Ill. App. 3d 701, 709 (1998), or, put another way, "fixed or determinable." *Servbest Foods, Inc.* v. *Emessee Indus., Inc.*, 82 Ill. App. 3d 662, 677 (1980). Identifying at what point the loss became fixed or determinable for purposes of allowing prejudgment interest depends in large part on the policy itself and the circumstances of each case. See *Di Leo* v. *United States Fid. & Guar. Co.*, 50 Ill. App. 2d at 192-193.

The difficulty here arises from the fact that the Pittsburgh litigation expenses continued to accumulate after CBI filed this litigation. CBI argues that it lost the use of the money it had to pay for litigation fees as the Pittsburgh litigation progressed — fees that London should have been paying under the policy, as those expenses were submitted pursuant to the policy's condition J, the latter portion of which provides as follows:

> "If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within thirty (30) days after they

become due on any bond, bill, promissory note, or other instrument of writing." 815 Ill. Comp. Stat. Ann. 205/2.

are respectively claimed and proven in conformity with this policy."

In response to the judge's rationale, CBI argues that the Pittsburgh litigation expenses were fixed or determinable once CBI paid them, at which point the policy provided that London was liable for them. Consequently, CBI maintains that, as of the filing of this suit in 1994, prejudgment interest should run on the fees CBI had paid to that date, with interest on subsequent amounts running from the dates CBI paid them, pursuant to the policy's "from time to time" provision for losses incurred after the insured's initial filing of a definite claim.

We think "fixed or determinable," under the terms of this policy at least, does not necessarily mean that the total amount owing must be final as of the date identified for calculating interest on amounts due. Because London denied liability for coverage in response to CBI's 1994 complaint, it follows that CBI was relieved from submitting additional proofs of claim as legal fees continued to accrue after 1994. Rather, under the policy's condition J, London's obligation to pay CBI's Pittsburgh litigation expenses arose as the ongoing legal fees were paid. We therefore agree with CBI that these figures were both fixed and determinable as they became due under the policy. See, e.g., *Zayre Corp.* v. *S.M. & R. Co.*, 882 F.2d 1145, 1157 (7th Cir. 1989) (applying Illinois law). Contrast *Oldenburg* v. *Hagemann*, 207 Ill. App. 3d 315, 327-328 (1991).[23]

Accordingly, as we construe the Illinois cases, prejudgment interest should be awarded for the Pittsburgh litigation expenses paid by CBI as of December 28, 1994, the date it filed this action, and thereafter as subsequent litigation expenses were paid. See *Servbest Foods, Inc.* v. *Emessee Indus., Inc.*, 82 Ill. App. 3d

[23]London argues that the extent of its indemnification was not fixed until resolution of the Pittsburgh litigation because, until the court determined the relative rights of the parties in that case, CBI's liability for cleanup costs was unknown. On the contrary, it is well established under Illinois law that prejudgment interest will be granted even though the legal rights of the parties and the amount of their respective liability is not decided until judgment. See *Servbest Foods, Inc.* v. *Emessee Indus., Inc.*, 82 Ill. App. 3d at 677-678; *La Grange Metal Prod.* v. *Pettibone Mulliken Corp.*, 106 Ill. App. 3d 1046, 1054 (1982); *Michigan Ave. Natl. Bank* v. *Evans, Inc.*, 176 Ill. App. 3d 1047, 1061 (1988); *New Hampshire Ins. Co.* v. *Hanover Ins. Co.*, 296 Ill. App. 3d at 709.

at 678. We therefore remand the matter to the Superior Court solely for that purpose.

B. *Loss of use of settlement funds.* As a final matter, CBI also sought interest on amounts it paid in settlements for the Weed site and the International Paper suit. Beazer ultimately reimbursed CBI for those sums following resolution of the Pittsburgh litigation. While CBI might have sought interest from Beazer, we agree with the judge that nothing in the policy requires London to pay interest on those funds.

V. *Disposition.* We remand this matter to the Superior Court for a determination of prejudgment interest on CBI's Pittsburgh litigation expenses in accordance with this opinion. In all other respects, the judgment is affirmed.

<div align="right">

*So ordered.*