650 F.Supp. 1553 (1987)
LIBERTY MUTUAL INSURANCE COMPANY
v.
THOSE CERTAIN UNDERWRITERS AT LLOYDS and Those British Companies Subscribing To Policies: K.12085, CU 5912, CU 5913.
Civ. A. No. 82-1122.
United States District Court, W.D. Pennsylvania.
January 14, 1987.
*1554 Frederick N. Egler, Pittsburgh, Pa., for plaintiff.
*1555 George E. McGrann, Pittsburgh, Pa., for defendant.

OPINION
GERALD J. WEBER, District Judge.
This matter has taken us rushing headlong into the past, to events which occurred over twenty years ago and which have now spawned 10 reported decisions in three separate lawsuits.[1] For the reader's sake we will condense that history as best we can.
Prior to 1965, life was relatively simple in Liberty Mutual's claims departments. Sometime in 1965, the company altered the structure of those offices to create two parallel positions: Claims Representative and Claims Adjuster. The company's hiring for these positions was gender-based, approaching 100% women in claims representative positions, and achieving 100% males in the claims adjuster position, over a 6 year period.
A class action suit was filed with this court in 1972, after percolating through the required administrative levels. Plaintiffs alleged that Liberty Mutual's practices in hiring, compensation, promotions, discharge and other conditions and incidents of employment violated Title VII. This court certified the class and ultimately concluded that the company's employment policies were discriminatory on the basis of sex. In 1978, the parties reached a settlement for an amount in excess of $5.5 million.
Following the settlement, Liberty Mutual began to look in earnest for coverage from its various insurers over the relevant span of time. One insurer won the race to the courthouse and filed a declaratory judgment action to determine liability on its policy of insurance. Appalachian Insurance Co. v. Liberty Mutual Insurance Co., Civil Action No. 78-1151 (W.D.Pa.)
In Appalachian, the insurer contended that it had issued an "occurrence" policy, that the "occurrence" giving rise to liability was Liberty Mutual's adoption of a discriminatory employment policy in 1965, and therefore Appalachian's policy covering a period from 1971-1974 was not applicable to the loss. We agreed and, on slightly different reasoning, the Circuit affirmed. 507 F.Supp. 59 (W.D.Pa.1981), aff'd 676 F.2d 56 (3d Cir.1982).
The present action represents Liberty Mutual's effort to pin down the applicable insurer. Defendants are underwriters on three policies of insurance issued to Liberty Mutual and covering the period 7/1/65-6/30/68.[2] Defendants interposed a number of defenses and after much wrangling over discovery the parties have raised several issues on cross motions for summary judgment. We have concluded that there are no disputed issues of material fact and we are therefore able to resolve these questions as described below.

I. Condition "J"
The Underwriters argue that Liberty Mutual failed to comply with the requirements of Condition J of the policies, a condition precedent to the Underwriters' liability, and therefore defendants have no obligation under these policies. This is the subject of cross motions for summary judgment, and there is no dispute as to the material facts.
Condition J provides, in its entirety:

*1556 J. LOSS PAYABLE 
Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. The assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters. If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.
Defendants caution, and we agree, that this provision is to be distinguished from the notice requirements of Condition G:
G. NOTICE OF OCCCURRENCE 
Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy, notice shall be sent as stated in Item 3 of the Declarations as soon as practible, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
The Underwriters freely admit that plaintiff provided prompt notice of the claim, satisfying Condition G, and this is not an issue in the litigation. The issue is the purport of Condition J, and the meaning of "definite claim."
Defendants liken Condition J to "proof of loss" provisions traditionally contained in fire and property insurance policies and in many excess insurance policies. In such policies, proof of loss is a condition precedent to liability and the failure to satisfy that condition within the time specified by the policy will excuse the insurer from its obligations. See, Romanos v. Home Insurance Co., 355 Mass. 499, 246 N.E.2d 173 (1969); Smith Beverages Inc. v. Metropolitan Casualty Insurance Co., 337 Mass. 270, 149 N.E.2d 146 (1958); Nichols v. Continental Insurance Co., 265 Mass. 509, 164 N.E. 442 (1929).[3]
In the defendants' view, Liberty Mutual's loss was fixed at the time of its settlement of the Wetzel suit, in September of 1978, and it paid out that sum in disbursements to individual class members in May, 1979. And yet, plaintiff made no demand for a specific sum until May 7, 1982, a delay of 3½ years, well outside the 12 month period provided by Condition J.
Defendants' argument fails on several counts. First of all, defendants interpret "definite claim" to mean a demand for a dollar figure, a sum certain. There is nothing in the policy to support this restrictive interpretation, but, in any event, the Underwriters were well aware of the amount of the Wetzel settlement, and therefore their exposure on the policies, at the time the settlement was achieved in 1978.
However, defendants contend that plaintiff represented that it intended to allocate the loss among all excess insurance policies for the years 1965-1974, and plaintiff's failure to allocate this loss in a timely fashion violated Condition J. What defendants conveniently omit from the equation is the birth, life and death of Appalachian Insurance Co. v. Liberty Mutual Insurance Co., Civil Action No. 78-1151 (W.D.Pa.). Appalachian insured Liberty Mutual for the period 8/1/71-7/31/74. It filed a declaratory judgment action to challenge Liberty Mutual's plan to allocate the Wetzel settlement *1557 among the various insurers from 1965 to 1974, and ultimately was successful. Appalachian, 507 F.Supp. 59 (W.D. Pa.1981); aff'd, 676 F.2d 56 (3d Cir.1982). During the pendency of this litigation, allocation was a question mark, and in the end, a nullity. The insured's failure to allocate a loss in a sum certain when the very process of allocation was under attack will not excuse the defendants from their obligations on the policies.
In light of the uncertainty cast by the Appalachian litigation on the insurance claims to be made by plaintiff, Liberty Mutual knew with certainty the amount of its claim against these underwriters only upon the conclusion of Appalachian. A demand for payment of the full amount of the Wetzel settlement was then promptly made on defendants, satisfying condition J.
As an alternative response, Liberty Mutual has argued that defendants waived, or are estopped from asserting, Condition J as a bar. Under Massachusetts law, employing the Underwriter's analogy to proof of loss provisions, where an insurer denies coverage on other grounds before expiration of the time allowed for proof of loss, the requirement of proof of loss becomes a useless gesture and is therefore deemed to be waived. E.g., Smith Beverage Inc. v. Metropolitan Casualty Insurance Co., 337 Mass. 270, 149 N.E.2d 146 (1958); Star Fastener v. American Employer's Insurance Co., 326 Mass. 728, 96 N.E.2d 713 (1951); Milton Ice Co. v. Travelers Indemnity Co., 320 Mass. 719, 71 N.E.2d 232 (1947); Jackson & Co. v. Great American Indemnity Co., 282 Mass. 337, 185 N.E. 359 (1933). The rationale is equally applicable to Condition J. The Underwriters had denied coverage for various reason ever since receiving the initial notice of claim in 1972. No purpose would be served by making a formal claim in light of the insurers' consistent denials of coverage.
Finally, we note with equal parts amusement and distaste the energy and expanse of paper employed by the Underwriters to argue that they were severely prejudiced by Liberty Mutual's failure to make a definite claim following the Wetzel settlement. Defendants in their brief assert:
"Quite literally, the Underwriters at risk on the policies in suit were in the dark for over three and one half years with respect to what Liberty Mutual was seeking from them by way of damages." (Defendants' Brief in Support of Motion for Summary Judgment at p. 23.)
We are not dealing here with babes in the woods. It is a certainty that defendants were aware of the Appalachian litigation and its import to the allocation of loss. Furthermore, defendants had been keeping watchful eye on the Wetzel suit since its inception, aided by periodic reports from Liberty Mutual, and by its own high priced watchdog, Mendes & Mount, retained as counsel in 1974 to monitor the Wetzel litigation and protect defendants' interests.
Other assertions of prejudice are likewise illusory. Defendants claim that Liberty Mutual's 3½ years delay in making a definite claim prevented them from fully exploring certain defenses grounded in events occurring in 1964 and 1965. First of all, it is hard to see why 17 years removed from events should be much worse than 14 years. But most important, there is absolutely no reason why the absence of a sum certain claim should inhibit investigation, investigation which should have begun shortly after notice of the claim was received in 1972.
For the reasons stated we conclude that plaintiff satisfied Condition J or, in the alternative, that defendant had waived it, and partial summary judgment will therefore be entered in favor of plaintiff and against defendant on this defense.

II. Date of Occurrence
Plaintiff seeks to establish on summary judgment that the "occurrence" which gives rise to liability on the policies, occurred within defendants' policy period. Defendants counter by asserting the existence of a factual issue as to when the "occurrence," that is the implementation of discriminatory employment practices, took place.
*1558 Plaintiff first contends that this issue has already been decided in Appalachian, and quotes several statements of this court and the Court of Appeals to the effect that Liberty Mutual's discriminatory practices and resulting injury began on July 2, 1965. However, a careful reading of the Appalachian decisions reveals that we were never called upon to decide the actual date of the occurrence, only whether it predated the Appalachian policy periods. Consequently, any date affixed to the occurrence in Appalachian must be viewed as dicta.
However, this does not preclude summary judgment. Employing the principles espoused in Appalachian for fixing the date of occurrence, we shall determine whether any factual dispute exists here. The Circuit set forth the test:
We hold that the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place. "There can be no question but that the aspect of the occurrence which must take place within a policy period ... is the `result,' that is, the time when the accident or injurious exposure produces personal injury." (quoting Eagle Picher Industries, Inc. v. Liberty Mutual Insurance Co., 523 F.Supp. 110, 114 (D.Mass. 1981).
Appalachian, 676 F.2d at 61-62. Defendant misses the mark then by urging an earlier date for implementation of Liberty Mutual's employment practices. The focus must be on the date when the injury is manifested and not merely when the operative causes occurred. Appalachian, 676 F.2d at 62; Bartholomew v. Appalachian Insurance Co., 655 F.2d 27 (1st Cir.1981).
Normally it would appear that such a cause and injury would be simultaneous, but here we have the unique chronological feature of a new statute, Title VII of the Civil Rights Act. It is this new statute which gave rise to the Wetzel plaintiffs' claims.[4] It is this new statute which defined their damages. When Title VII became effective July 2, 1965, it defined a wrong and created a cause of action for damages. The Wetzel plaintiffs' claims were defined by that statute and its effective date, and even the ultimate settlement was limited to damages occurring on or after July 2, 1965.
Consequently, the date when Liberty Mutual actually implemented its employment policies is irrelevant because the manifestation of injury resulting from those policies is concurrent with the effective date of Title VII. There is no dispute about that date and it falls within defendants' policy period. Summary judgment on this issue will therefore be granted in favor of plaintiff.

III. Coverage For Loss Accruing After Policy Period
Having decided that the discriminatory act and injury occurred within the defendants' policy period, we now determine the extent of the coverage period for the resulting damages. Plaintiff contends that defendants' policies are "occurrence" policies and therefore cover all damages, regardless of date, which derive from the original occurrence. Defendants argue that they are liable only for damages sustained by class members employed by Liberty Mutual during defendants' policy periods. Both parties seek summary judgment on this issue and there are no disputed issues of material fact.
We must first examine the defendants' policies to determine whether they are to be characterized as "occurrence" policies or "claims made" policies. The distinction has been stated as follows:
An "occurrence" policy protects the policy holder from liability for any act done while the policy is in effect, whereas a "claims made" policy protects the holder only against claims made during the life of the policy.
St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).
*1559 The language of defendants' policies is quite clear on this point. Defendants' obligations arise with the occurrence:
1. Coverage
Underwriters hereby agree ... to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability
a.) imposed by law or
b.) assumed under contract or agreement by the Named Assured ... for damages ... on account of:___
(1) personal injuries, ...
(2) ...
caused by or arising out of each occurrence happening anywhere in the world.
While such language was sufficient to establish the "occurrence" nature of the subject policy in Appalachian, 676 F.2d at 60-61, we also note that the deductible is computed on a per occurrence basis, and "ultimate net loss" is defined as the total obligation arising from an occurrence.
Finally, we point out the following provision which appears in each of the policies and is designated as Condition C in Policy No. K-12085:
... in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the assured for liability in respect of such personal injury or property damage without payment of additional premium.
There can be no clearer indication that these policies were intended to provide coverage for all damages regardless of when they occurred, provided they are derived from the "occurrence" which triggers coverage. Defendants' policies are plainly "occurrence" policies.
Defendants seem to argue that their policies are something of a hybrid of the occurrence and claims made policies. Specifically, defendants contend that they are responsible for all damages arising from the original "occurrence" of discrimination, even if those damages arose after the policy period, as long as the employee suffering such damage was employed by Liberty Mutual during the policy period. The corollary is that defendants are not responsible for any damages sustained by employees joining Liberty Mutual after defendants' policy period. Neither the policies nor the reported decisions support this construction.
Defendants base their argument on the policy definition of "occurrence:"
The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury ... during the policy period. (emphasis added).
Read plainly this provision requires an act and injury within the policy period as a precondition to coverage. Defendants argue that this provision requires injury to each individual within the policy period as a prerequisite to liability for each individual's damages. However, this section does not go as far as defendants would like it to.
As we have seen in an earlier portion of this opinion, the timing of an occurrence for the purpose of determining coverage is defined as the time when the injury or effect of the occurrence is first manifested. Appalachian, 676 F.2d 56, 61-62. The above-quoted definition of "occurrence" is simply a reaffirmation of that principle. Just as in Appalachian, an occurrence which gives rise to liability must result in injury during the policy period. Furthermore, as we concluded above, that injury did first manifest itself during the defendants' policy periods.
With regard to the defendants' reading of the definition of "occurrence," there is nothing in that provision to support the distinction between class members based on date of employment. Furthermore, such a reading is contrary to Condition C quoted above. That section provides for the payment of all damages arising from the occurrence. It does not provide a distinction based on dates of employment, or on any other event.
The essence of defendants' argument, with the semantic overlay removed, is that each individual's injury is a separate "occurrence," *1560 and coverage is therefore defined by the date of initial injury to each individual. This multiple occurrence theory was specifically rejected in Appalachian where the court held that there was only one "occurrence," the institution of discriminatory employment policies.
In Appalachian the Circuit stated that the policy's definition of "occurrence," identical to the one here, "contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time." 676 F.2d at 61. The same is true of Condition C which further contemplates responsibility for all damages deriving from that one occurrence. In this regard it is consistent with the reasonable expectations of an insured concerning the operation of an "occurrence" policy. 676 F.2d at 62; Keene v. INA, 667 F.2d 1034, 1042 and n. 12 (D.C. Cir.1981).
The defendants' theory of apportioning damages based on the timing of injury to individuals is contrary to the plain meaning of the policies and has been rejected on a nearly identical policy in Appalachian. 507 F.Supp. 59, 62; 676 F.2d at 60-61. Consequently, defendants' "occurrence" policies provide full coverage for all damages or loss related to the original occurrence, without regard to the date of actual damage or loss to the individual members of the class.

IV. Coverage for Back Pay
Defendants seek to avoid responsibility for the lion's share of the Wetzel settlement, the $4.4 million paid as back pay. Defendants contend that back pay is not within the policy's definition of "ultimate net loss" and the employer is solely responsible for wages owed his employees.
The basic insuring agreement obligates the insurer "for damages, direct or consequential and expenses, all as more fully defined by the term `ultimate net loss' on account of: (1) personal injuries." The policy defines "personal injury" to include "discrimination." The policy defines "ultimate net loss" as follows:
c) The term "ultimate net loss" shall mean the total sum which the assured or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachments or appeal bonds, interest, expenses for doctors, lawyers, nurses, investigators and other persons, for litigation, settlements, adjudgment, and investigation of claims and suits which are paid as a consequence of any occurrence, covered hereunder excluding only the salaries of the assured's or of any underlying insurer's permanent employees.
For the sake of clarity we note at the outset that the specific references to "salaries" and "wages" in the above provision only define expenses of litigation and are not pertinent to the discussion of back pay awards. Neither party has contended otherwise.
Defendant first explores a number of cases which stand for the principle that back pay is not "damages" in the strict sense, but rather an equitable remedy. E.g., Albemarle Paper Company v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir.1969); James v. Stockham Valves and Fittings Co., 394 F.Supp. 434 (N.D.Ala. 1975). The logic of this semantic exercise is lost on us, perhaps because defendant compares apples and oranges.
The cases cited do not deal with the construction and interpretation of insurance policies. Rather they demonstrate a hypertechnical distinction between "damages" and equitable relief which has no relevance beyond the narrow scope of those cases. They certainly should not be employed to define "damages" in an insurance policy where such terminology is to be construed in accord with the plain meaning of the term and the reasonable expectations of the insured. We do not believe the specialized definition employed in the cases *1561 cited by defendants serve these goals of construction.
Defendants also argue that the back pay obligation embodied in the Wetzel settlement is merely the delayed obligation of Liberty Mutual to pay proper wages to its employees. Thus, as the argument seems to run, because Liberty Mutual and not the Underwriters had the duty to pay appropriate wages to its employees from 1965 to 1973, then Liberty Mutual and not the Underwriters should pay those wages upon settlement of the employees' claims for them.
On its face the argument may have appeal for some, but it is specious. There is nothing in the policy to distinguish between lost wages due to discrimination and lost wages due to any other personal injury. To the contrary, the language of the policy is very broad on the scope of damages, and of "ultimate net loss," as would be expected in an excess policy such as this.[5]
The Underwriters' policies, by virtue of the plain meaning of the broad definitions of "damages" and "ultimate net loss," include coverage for the back pay components of the Wetzel settlement. Summary judgment on this issue will be entered in favor of plaintiff.

V. Conclusion
For the reasons stated above, we have concluded that partial summary judgment in favor of plaintiff is appropriate on the following matters:
I. Plaintiff satisfied Condition J of the policy, or in the alternative defendants waived it.
II. The "occurrence," as defined by the Third Circuit in Appalachian, falls within defendants' policy period.
III. Defendants' policies cover losses attributable to all class members, regardless of their dates of initial employment.
IV. The policies' definition of "damages" and "ultimate net loss" includes coverage for back pay awards due to discrimination.
Therefore, partial summary judgment will be entered in favor of plaintiff and against defendants on these issues.
With the aid of the parties, we must now proceed to identify the issues remaining in this litigation and what discovery, if any, is necessary. To this end a supplemental status conference will be scheduled, at which time all counsel shall be prepared to speak on these matters.
An appropriate order will issue.
NOTES
[1] The bibliography to date: Wetzel v. Liberty Mutual Insurance Co., (Wetzel I) 372 F.Supp. 1146 (W.D.Pa.1974) (Weber, D.J.), aff'd in relevant part (Wetzel II) 508 F.2d 239 (3d Cir.1975), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); pregnancy benefits issue aff'd (Wetzel III) 511 F.2d 199 (3d Cir.1975), cert. granted 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476 (1975), vacated and remanded (Wetzel IV) 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976), appeal dism'd, 535 F.2d 1248 (3d Cir.1976); district court order vacated (Wetzel V) 579 F.2d 236 (3d Cir.1977); equal pay claims (Wetzel VI) 449 F.Supp. 397 (W.D.Pa. 1978) (Weber, C.J.); statute of limitations issue (Wetzel VII) 451 F.Supp. 967 (W.D.Pa.1978) (Weber C.J.); Appalachian Insurance Co. v. Liberty Mutual Insurance Co., 507 F.Supp. 59 (W.D.Pa.1981) (Weber, C.J.), aff'd 676 F.2d 56 (3d Cir.1982).
[2] The three policies in issue are: K-12085; CU. 5912; and CU.5913. The latter two policies incorporate the terms and conditions of the underlying umbrella policy, K-12085.
[3] Defendants contend that Massachusetts law is controlling here because Liberty Mutual is domiciled in Massachusetts and the policies were issued there. Plaintiff has not opposed this choice of law, and so we will apply Massachusetts law.
[4] Even the so called "equal pay" claims were ultimately won not on the earlier Equal Pay Act, 29 U.S.C. § 206 (1963), but Title VII. See Wetzel VI, 449 F.Supp. 397, 407.
[5] What defendants seem to urge upon us in the guise of construction is a philosophical argument about the insurability of back pay awards in discrimination suits. This matter, if an issue at all, was raised only obliquely and we make no comment on it.