In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00121-CV
_____

**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES, Appellants**

**V.**

**CHICAGO BRIDGE & IRON COMPANY, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 12-03-02362 CV**

**OPINION**

Chicago Bridge & Iron Company ("CB&I") was a defendant in litigation involving allegations of exposure to and inhalation of airborne asbestos fibers by workers at the Bogalusa Paper Mill ("Bogalusa Mill"). The Bogalusa Mill consisted of different areas and pieces of equipment. From 1936 to 1965, CB&I built or installed numerous vessels or structures at the Bogalusa Mill and these

1

structures held asbestos-containing parts or insulation. Several claims against CB&I were dismissed without a finding of liability and others were settled.

Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively "London") had insured CB&I through numerous liability insurance policies. CB&I sued London for reimbursement of amounts expended to defend against and settle the asbestos claims. The parties chose ten representative claimants from the Bogalusa Mill case to determine whether CB&I settled an otherwise covered loss in reasonable anticipation of personal liability. A jury found that the settlement amounts CB&I paid were not reasonable and determined which amounts were reasonable. The parties reached a stipulation regarding the remaining Bogalusa Mill claims.

The trial court entered a judgment in accordance with summary judgment rulings, directed verdict rulings, and the jury's verdict. In its judgment, the trial court found that London breached its contract with CB&I and awarded CB&I damages. In seven appellate issues, London challenges several of the trial court's legal and evidentiary rulings and the dismissal of its defenses. In its cross-appeal, CB&I contends that claims based on CB&I's completed operations constitute one occurrence. We affirm the trial court's judgment.

Collateral Estoppel

In issue one, London challenges the trial court's application of the collateral estoppel doctrine in its summary judgment ruling. We review a trial court's summary judgment ruling under a *de novo* standard of review. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence in the light most favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts against the motion. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam).

The trial court granted CB&I's partial motion for summary judgment, in which CB&I alleged that collateral estoppel barred London from relitigating the extent of coverage issue addressed in *Chicago Bridge & Iron Company v. Certain Underwriters at Lloyd's, London*, 797 N.E.2d 434 (Mass. App. Ct. 2003), *review denied*, 803 N.E.2d 332 (Mass. 2004), and argued that London's theory of *pro rata* allocation should be rejected. In *Chicago Bridge*, CB&I obtained a judgment that required London to indemnify CB&I for "environmental cleanup and litigation expenses in connection with a lumber company's processing operation, which contaminated a number of sites across the country with creosote over a period of some fifty years." *Chicago Bridge*, 797 N.E.2d at 436. The case involved multiple

sites and policies, as well as long-term environmental damage; the property damage could not be assigned to any particular moment in time. *Id*. London had agreed to indemnify CB&I for all sums that CB&I had to pay by reason of liability imposed by law. *Id*. at 440. Although the policy made no express reference to *pro rata* allocation of damages, London urged *pro rata* allocation, meaning that London would be liable for its proportionate share of CB&I's total expenses while CB&I would be liable for its proportionate share of expenses incurred in periods during which it carried no insurance to cover the loss. *Id*. CB&I argued that London was liable for all sums incurred by CB&I as a result of the contamination regardless of the period in which the contamination occurred. *Id*.

The Massachusetts Appeals Court explained that London's obligation to cover a loss was triggered by an occurrence, which the policy defined as

> an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

*Id*. at 440-41. The policies defined "ultimate net loss" as follows:

> [T]he total sum which the Assured . . . becomes obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums

4

on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder.

*Id*. at 441. The policies also contained the following conditions:

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

*Id*. The Court explained that these conditions would be superfluous "had the drafter intended that damages would be allocated among insurers based on their respective time on the risk." *Id*. The Court found that the "definition of 'occurrence,' which provides that the duty to indemnify is triggered even if only some of the property damage occurs during the policy period, provides no [] basis for limiting indemnification to only those damages occurring during the policy period." *Id*. at 442-43. Thus, the Court rejected *pro rata* allocation. *Id*. at 440, 443.

On appeal, London contends that the doctrine of collateral estoppel does not apply, *Chicago Bridge* is not binding law, and *Chicago Bridge* is distinguishable

5

from the present case. The parties agree that Illinois law governs interpretation and construction of London's insurance policies. When determining the preclusive effect of *Chicago Bridge*, however, we must give full faith and credit to Massachusetts's judicial proceedings. *See Bryant v. United Shortline Inc. Assur. Servs., N.A.*, 972 S.W.2d 26, 28 (Tex. 1998); *see also Morris B. Chapman & Assocs. v. Kitzman*, 739 N.E.2d 1263, 1267-68 (Ill. 2000). Under Massachusetts law, "'[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Alba v. Raytheon Co.*, 809 N.E.2d 516, 521 (Mass. 2004) (quoting *Martin v. Ring*, 514 N.E.2d 663, 664 (Mass. 1987)). The collateral estoppel doctrine applies when there was a final judgment on the merits in the prior adjudication, the party against whom estoppel is asserted was a party to the prior adjudication, and the issue decided in the prior adjudication is identical to the one presented in the action in question and was essential to the judgment. *Id*.

The disputed question is whether *Chicago Bridge* dealt with the issue present in this case. London attempts to avoid application of the collateral estoppel doctrine by contending that *Chicago Bridge* is distinguishable because it (1) dealt with property damage from pollution that could not be assigned to a particular

6

moment in time, while this case involves personal injury claims with "specific activities causing injury to the specific claimant at a specific time" and, unlike the present case, the parties in *Chicago Bridge* agreed to the number of occurrences; (2) did not recognize the policy provision limiting covered injuries to those that occur during the policy period, but subsequent Illinois decisions have recognized this limitation and applied *pro rata* allocation instead of an all sums allocation; and (3) failed to address horizontal exhaustion, the differences between excess and primary policies, and the "other insurance" clause in the policies. London argues that its policies limit coverage to injuries occurring during the policy period and that when damages cannot be allocated to a given policy period, *pro rata* allocation applies.

We are not persuaded by London's attempt to distinguish *Chicago Bridge*. In both *Chicago Bridge* and this case, London agreed to indemnify CB&I for all sums which CB&I became obligated to pay by reason of liability imposed by law for direct or consequential damages and expenses on account of personal injury caused by or arising out of each occurrence. *See Chicago Bridge*, 797 N.E.2d at 440-41. Likewise, coverage is triggered by an accident, happening, event, or continuous or repeated exposure to conditions that unexpectedly and

7

unintentionally result in personal injury or property damage during the policy period.

The definition of "ultimate net loss" in this case mirrors the definition found in *Chicago Bridge*:

> [T]he total sum which the Assured . . . become[s] obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder. . . .

*See id*. at 441. Other virtually identical provisions state:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon . . . shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

> . . . [I]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

*See id*. *Chicago Bridge* determined that these types of clauses mean that (1) London contracted to indemnify CB&I for losses from an occurrence that resulted in some damage taking place during a policy period; and (2) the extent of coverage

8

is not limited to the policy period in which the damage occurred. *Id.* at 442-43. London points to no provision in the insurance policies that imposes *pro rata* allocation. We conclude that whether the extent of coverage is determined by a *pro rata* approach or an all sums approach has already been litigated in *Chicago Bridge* and is the same issue London sought to relitigate in the present case.

London further contends that application of collateral estoppel would be inequitable and that the pollution claims in *Chicago Bridge* are unrelated to the asbestos claims in this case. Exceptions to the collateral estoppel doctrine apply when (1) the issue is one of law and the actions involve claims that are substantially unrelated; or (2) a new determination is justified to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the law. *Fidler v. E.M. Parker Co.*, 476 N.E.2d 595, 601 (Mass. 1985). The claims in *Chicago Bridge* and this case are substantially related, *i.e.*, both cases involve claims by CB&I against London for insurance coverage and arise out of the same subject matter. *See* Restatement (Second) of Judgments § 28 cmt. b (1982) ("When the claims in two separate actions between the same parties are the same or are closely related -- for example, when they involve asserted obligations arising out of the same subject matter -- it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion. If the

issue has been actually litigated and determined and the determination was essential to the judgment, preclusion will apply."). However, "[e]ven when claims in two actions are closely related, an intervening change in the relevant legal climate may warrant reexamination of the rule of law applicable as between the parties." Restatement (Second) of Judgments § 28 cmt. c.

*Chicago Bridge* relied primarily on *Zurich Insurance Company v. Raymark Industries, Inc.*, 514 N.E.2d 150 (Ill. 1987), when rejecting London's *pro rata* allocation of damages theory. *Chicago Bridge*, 797 N.E.2d at 439-45. Illinois law does apply *pro rata* allocation in certain circumstances. *See Fed. Ins. Co. v. Binney & Smith, Inc.*, 913 N.E.2d 43, 56-58 (Ill. App. Ct. 2009). In cases such as *Chicago Bridge* and the case at bar, however, the following provision allows for coverage outside the policy period and is inconsistent with the theory of *pro rata* allocation:

> [I]n the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy [the insurer] will continue to protect the [policyholder] for liability in respect of such personal injury or property damage without payment of additional premium.

*Chicago Bridge*, 797 N.E.2d at 441; *see Binney & Smith*, 913 N.E.2d at 56 ("A policy period limitation to coverage is exactly what was missing from the insurance contracts at issue in *Zurich*, allowing for the proper application of joint and several liability under the 'all sums' rule."). Accordingly, we conclude that

there has been no intervening change in the applicable law, such that a new determination is justified or that application of the collateral estoppel doctrine would result in an inequitable administration of the law. *See Fidler*, 476 N.E.2d at 601; *see also* Restatement (Second) of Judgments § 28 cmt. c. Because the determination in *Chicago Bridge* is conclusive in the current action between the parties, the trial court properly granted CB&I's partial motion for summary judgment on the application of the collateral estoppel doctrine. *See Alba*, 809 N.E.2d at 521; *see also Mayes*, 236 S.W.3d at 755. We overrule issue one.

## Number of Occurrences

In issue two, London challenges the trial court's directed verdict ruling that the underlying claims involve a single occurrence. In its cross-appeal, CB&I argues that the trial court failed to find that claims arising from completed operations constitute a single occurrence. We review a trial court's ruling on a motion for directed verdict under a legal sufficiency standard. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822. We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 807, 827.

"[T]he number of occurrences is determined by referring to the cause or causes of the damages." *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 287 (Ill. 2006). When each asserted loss results from a separate and intervening human act or each act increased the insured's exposure to liability, each loss is deemed to have arisen from a separate occurrence. *Id*. at 294. When each asserted loss emanates from a single cause, there will be only one occurrence. *Id*. Only when injuries result from an ongoing omission, as opposed to affirmative acts of negligence, must the "time and space test" be applied, meaning that injuries will be deemed to have arisen from one occurrence if the cause and result are simultaneous or so closely linked in time and space as to be considered by the average person as a single event. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 754, 756 (Ill. 2009); *Ware v. First Specialty Ins. Corp.*, 983 N.E.2d 1115, 1123 (Ill. App. Ct. 2013).

> According to London's policies, an "occurrence" constitutes
>
> an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury . . . during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

CB&I filed a motion for partial summary judgment on grounds that the asbestos claims formed a single occurrence. The trial court granted the motion and held:

12

. . . CB&I's activities at each site are found to constitute at least one occurrence. As such, there are multiple occurrences involved in this case. Regarding multiple allegations of exposure at one given site, the Court holds that it is a fact question as to whether or not there is more than one occurrence at each site, but the Court will consider multiple claims at a given premise, location, and involving virtually identical conditions as having arisen out of a single occurrence.

The trial court later granted a directed verdict on this issue and found the existence of one occurrence. In its findings of fact, the trial court explained that the underlying claimants marshaled evidence demonstrating that asbestos fibers were regularly released from CB&I's structures because of normal operations and maintenance, which resulted in continuous and repeated asbestos exposure during the coverage period. In its judgment, the trial court found that "general conditions" refers to "the presence of the injury-producing agent, *e.g.*, released asbestos" and "premises location" refers to the entire Bogalusa Mill and not individual plant structures or pieces of equipment. The trial court concluded that the mill workers' claims arose from "'exposure to substantially the same general conditions existing at or emanating from one premises location' and thus arose from a single occurrence."

On appeal, London contends that the release of asbestos at the Bogalusa Mill "varied in time and space, [was] infrequent and episodic, and [was] caused by intervening human acts[.]" According to London, CB&I's liability arises from

13

installation, construction, or repair, not the manufacture, sale, or distribution of asbestos-containing products.[1]

*Nicor* involved affirmative acts of negligence in which Nicor employees or subcontractors spilled mercury while replacing regulators. *See Nicor*, 860 N.E.2d at 295. The spills had no common cause, were extremely rare, resulted from a variety of circumstances, and occurred at different times. *Id.* The *Nicor* Court found that the case involved multiple occurrences, not one omnibus occurrence:

> Giving the words of the policies their plain and ordinary meaning, as we must, the 195 spills were not "one happening," they were not derived from "one event," and they were not all part of "an accident." Moreover, they cannot be characterized as involving "continuous or repeated exposure to conditions which result in [injury, death or physical damage to or destruction of property]." They were sporadic, not part of an uninterrupted process, and in no instance evident in the record was any customer's home ever subject to more than one exposure to mercury contamination. The exposure therefore could not have been "repeated."
>
> . . .

---

[1]London also argues that CB&I engaged in numerous different types of construction activities over a period of decades at different locations far apart from one another and that each activity at each site gives rise to a separate occurrence. The trial focused on ten representative claimants from the Bogalusa Mill and whether CB&I settled an otherwise covered loss in reasonable anticipation of personal liability. *See U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1244 (Ill. App. Ct. 1994) ("[I]f an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in 'reasonable anticipation of liability'"). Our review is limited to whether the trial court properly found that the Bogalusa Mill workers' claims arise out of a single occurrence.

> The legal action is not the operative "happening," "event," or "accident" giving rise to liability under the policies. The spills are, and the damages associated with the 195 specific spills covered by the polices can be and have been specifically identified.

*Id*. at 296 (footnote omitted).

Unlike *Nicor*, this case involves continuous or repeated exposures to a condition, airborne asbestos fibers, that resulted in injury. The exposure to asbestos itself is the cause of the claimants' injuries and it is virtually impossible to determine the amount of released airborne fibers or when the releases occurred. *See U.S. Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1256-57 (Ill. App. Ct. 1994); *see also Bd. of Educ. v. TIG Ins. Co.*, 881 N.E.2d 957, 961 (Ill. App. Ct. 2007). That the time, type, or extent of exposure may differ is not conclusive because the policy language imposes no requirement that those conditions be identical or close in space and time, but merely requires exposure to "substantially the same general conditions." *See Nicor*, 860 N.E.2d at 286 ("The words of a policy should be accorded their plain and ordinary meaning[]" and when the policy's provisions are clear and unambiguous, they will be applied as written unless doing so would violate public policy.).

Moreover, although the Bogalusa Mill may be comprised of different areas and equipment or one area might contain more fibers than another, the trial court's conclusion that "premises location" refers to the entire Bogalusa Mill and not

15

individual plant structures or equipment is in accord with the plain meaning of the word "premises." *See id.*; *see also* BLACK'S LAW DICTIONARY 1219 (8th ed. 2004) ("premises" refers to "[a] house or building, along with its grounds[.]"). Under the circumstances of this case, we conclude that the plain language of London's policies supports the trial court's determination that the asbestos exposure claims arise out of a single occurrence. Because this case does not involve an ongoing omission, we need not apply the "time and space test." *See Ware*, 983 N.E.2d at 1123. We overrule London's second issue.

In its cross-appeal, CB&I contends that claims based on exposure to CB&I's completed vessels and allegations that (1) the vessels were unreasonably dangerous because they consisted of asbestos-containing components or insulation that CB&I knew or should have known would be applied, and (2) CB&I's breach of a purported duty to warn end users of associated hazards, derive from a common cause and constitute a single occurrence. According to CB&I, London's policies recognize a parallel between these types of claims and products liability claims. The policies define "products liability" as:

> (a)    Liability arising out of goods or products manufactured, sold, handled or distributed by the Named Assured . . . if the occurrence occurs after possession of such goods or products has been relinquished to others by the Named Assured . . . ;

16

> (b)   Liability arising out of operations, if the occurrence occurs after such operations have been completed. . .

CB&I argues that, like products liability claims, completed operations claims arise from a common predicate.

Under Illinois law, claims arising out of the manufacture and sale of asbestos-containing products have been deemed to constitute one occurrence. *U.S. Gypsum*, 643 N.E.2d at 1258-59; *see Nicor*, 860 N.E.2d at 298. In the context of mass product defects, the negligent manufacture or testing of the products is often the underlying cause. *Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 769 (7th Cir. 2010). In this case, however, CB&I did not manufacture the asbestos-containing parts. According to the record, CB&I obtained asbestos or asbestos-containing products from another vendor and incorporated those parts into its seal application or gaskets. CB&I's liability is not predicated on the manufacture or distribution of asbestos-containing products. *See Nicor*, 860 N.E.2d at 298; *see also U.S. Gypsum*, 643 N.E.2d at 1258-59. Thus, to the extent the trial court's judgment can be construed as determining that claims regarding CB&I's completed operations do not give rise to a single occurrence, each completed operation is a separate occurrence instead of one omnibus occurrence. *See Nicor*, 860 N.E.2d at 298. We overrule CB&I's sole issue on cross-appeal.

Defense Costs

In issue three, London contends that it had no duty to defend CB&I for dismissed claims. "[E]xcess policies seldom provide a separate duty to defend." *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 494 N.E.2d 634, 651 (Ill. App. Ct. 1986). Instead, they "require the excess insurer to indemnify the insured for the costs of defense as part of the 'ultimate net loss' against which the policy insures." *Id.*

In this case, the policies provide "Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured." The policies also state:

> Underwriters hereby agree . . . to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability . . . imposed upon the Assured by law, or . . . assumed under contract or agreement . . . for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of . . . [p]ersonal [i]njuries . . . caused by or arising out of each occurrence happening anywhere in the world.
>
> . . .
>
> The term "Ultimate Net Loss" shall mean the total sum which the Assured . . . becomes obligated to pay by reason of personal injury . . . , either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation,

18

settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder. . .

The trial court found that London must indemnify CB&I for successfully defended claims. On appeal, London contends that it is only required to indemnify CB&I for defense costs that arise from covered occurrences and that to be covered, the insured must actually incur liability from a judgment or settlement.

In *Zurich*, the Illinois Appellate Court held that the definition of "ultimate net loss" does not impose upon the insurer a duty to defend, but does impose a duty upon the insured to pay for the costs of defense:

> 'Ultimate Net Loss' shall mean the total sum which the insured, or the insured's underlying insurance as scheduled, or both, become obligated to pay by reason of Personal Injuries, Property Damage or Advertising Liability claims, either through adjudication or compromise, and shall also include expenses consisting of: hospital, medical, and funeral charges; all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or legal bonds, interest, expenses for doctors, lawyers, nurses, and investigators and other persons; litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any Occurrence covered hereunder . . .

*Zurich,* 494 N.E.2d at 651. In this case, London's policies provide coverage for liability imposed by law or assumed by CB&I under contract or agreement. The definition of "ultimate net loss" mirrors that in *Zurich*, and allows recovery for sums, including expenses such as law costs, lawyers, litigation, settlement, adjustment, and investigation of claims, that CB&I became obligated to pay by

19

either adjudication or compromise. *See id*. We construe these provisions not as requiring London to assume charge of CB&I's defense, but to pay for the costs of defense. *See id*. The applicable provisions neither limit recovery to claims for which liability is imposed nor exclude recovery for successfully defended claims. *See generally Nicor*, 860 N.E.2d at 286. The trial court did not err by requiring London to indemnify CB&I for defense costs that include dismissed claims. We overrule issue three.

Self-insured Retentions

In issue four, London contends that the trial court failed to properly apply three self-insured retentions ("SIR"). A SIR represents "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that must be paid before the insurer will pay benefits[.]" BLACK'S LAW DICTIONARY 1391 (8th ed. 2004). The SIR provision in London's policies provides that "[u]nderwriters hereon shall only be liable for the ultimate net loss the excess of either (a) the amounts covered under the Schedule of Underlying Insurances or (b) $100,000 ultimate net loss in respect of each occurrence, whichever is the greater[.]"

According to London, there are three policy periods: (1) March 18, 1961 through August 1, 1963, (2) August 1, 1963, through December 1, 1966, and (3) December 1, 1966, through February 2, 1970. London argues that numerous claims

are not compensable under each SIR because the "exposure periods terminated before or began after those dates" and that CB&I must target all three SIRs before it can recover for the Bogalusa Mill claims in each coverage period. As previously discussed, this case involves a single occurrence. By its plain language, the SIR provision requires CB&I to satisfy one SIR per occurrence, not one SIR per occurrence for each policy period. *See Fay,* 905 N.E.2d at 753 ("An insurance contract will be liberally construed in favor of the insured."); *see also Nicor,* 860 N.E.2d at 286. Accordingly, CB&I was only required to satisfy one SIR. We overrule issue four.

Exclusion of Opinion Testimony from Dr. Joseph Renn

In issue five, London challenges the trial court's exclusion of evidence that the claimants had not suffered actual injury. We review a trial court's evidentiary rulings under an abuse of discretion standard. *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex. 2005).

CB&I filed a motion to exclude the testimony of Dr. Joseph Renn. According to London's offer of proof, Renn would opine that (1) none of the claimants had asbestosis, (2) the claimants' diagnoses were flawed, (3) "consistent with asbestosis" is not the same as an actual diagnosis of asbestosis, (4) other conditions are consistent with asbestosis, (5) the claimants' pulmonary function

21

tests ("PFT") were not properly performed, and (6) the PFTs were normal when correctly performed. London maintained that this evidence was necessary to enable the jury to determine whether CB&I had a reasonable anticipation of liability and paid a reasonable amount to settle the claimants' cases. The trial court disagreed, explaining that the issue is whether the parties believed that an injury existed, not that an injury actually did exist.

On appeal, London argues that exposure to asbestos does not equate with bodily injury and contends that it should have been allowed to present evidence that none of the claimants actually contracted asbestosis. However, the definition of "bodily injury" is not determined on a case-by-case basis; rather, "bodily injury" occurs "at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos." *Zurich*, 514 N.E.2d at 161; *see John Crane, Inc. v. Admiral Ins. Co.*, No. 1-09-3240, 2013 Ill. App. LEXIS 109, at **45-47 (Ill. App. Ct. Mar. 5, 2013). Moreover, as in *U.S. Gypsum,* the issue before the jury was "whether the type of injury claimed is within the policies' ambit of coverage, not whether any damage occurred in the underlying action below." *U.S. Gypsum*, 643 N.E.2d at 1243. Whether the claimants actually suffered from asbestosis is irrelevant and would have confused or misled the jury as to the issue in the case. *See id*; *see also* Tex. R. Evid. 401, 403; *John Crane*,

22

2013 Ill. App. LEXIS 109, at *46. The trial court did not abuse its discretion by excluding evidence regarding whether the claimants actually suffered from asbestosis. *See Living Ctrs. of Tex.*, 175 S.W.3d at 261. We overrule issue five.

Compliance with Notice Provisions

In issue six, London contends that the trial court erroneously granted a directed verdict in favor of CB&I regarding London's defense that CB&I breached the notice provision in the insurance policies. London argues that the trial court abused its discretion by allowing CB&I to admit evidence of notice and that CB&I relied on inadmissible documents to show compliance with the insurance policies' notice requirements.

The insurance policies contain the following notice provision:

> Whenever the Assured has information from which the Assured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, is likely to involve this Policy, notice shall be sent . . . as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

At trial, CB&I sought to introduce a redacted email from its attorney to London's attorney and an omnibus submission providing London with information regarding the underlying asbestos claims. The original email stated that the submission was "for settlement purposes only." London objected to admission of these documents

23

on grounds that they were not properly authenticated, were inadmissible hearsay, and were inadmissible settlement negotiations. The trial court overruled the objections. The trial court also granted CB&I's motion for directed verdict, in which CB&I argued that it provided reasonable notice to London through regular omnibus submissions.

Evidence of settlement negotiations is inadmissible to prove liability for or invalidity of a claim or its amount. Tex. R. Evid. 408. Exclusion is not required when the evidence is offered for another purpose, such as proving bias, prejudice, or interest of a witness or party, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. *Id.* Whether documents constitute an offer of settlement depends on "whether something is given up by one of the parties to avoid litigation where some concession is made by one or both of the parties." *Tatum v. Progressive Polymers*, 881 S.W.2d 835, 837 (Tex. App.—Tyler 1994, no writ). The trial court may properly exercise its discretion when deciding whether evidence is impermissibly offered as evidence of a settlement offer or is offered for another valid reason. *TCA Bldg. Co. v. Nw. Res. Co.*, 922 S.W.2d 629, 636 (Tex. App.—Waco 1996, writ denied).

London argues that it made no contention of undue delay at trial and that the reasonableness of notice was not at issue. Nevertheless, even absent an exception

to Rule 408, otherwise discoverable evidence need not be excluded merely because it is presented in the course of settlement negotiations. *See* Tex. R. Evid. 408. The record does not indicate that CB&I sought to admit the exhibits into evidence for purposes of showing London's liability. *See id.* The documents cannot be construed as a concession by either party and were not offered as evidence that London made an agreement with CB&I acknowledging liability. *See Tatum*, 881 S.W.2d at 837. Under these circumstances, the trial court properly exercised its discretion when concluding that the evidence was being offered by CB&I for a purpose other than liability, invalidity of a claim, or the amount of a claim. *See TCA Bldg. Co.*, 922 S.W.2d at 636.

London further complains that CB&I improperly introduced the exhibits through CB&I's corporate counsel and for the truth of the matter asserted. A statement constitutes hearsay when it is made out of court and is offered into evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Evidence offered to show that a party had notice is not inadmissible hearsay. *In re Morrison,* 555 F.3d 473, 483 (5th Cir. 2009); *U.S. v. Cent. Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984); *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 791 (Tex. App.—Dallas 1992, writ denied). Moreover, a document is authenticated

"by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a).

Walter Browning, CB&I's managing general counsel of corporate and compliance, testified that he was responsible for informing insurers about the asbestos litigation and oversaw creation of a database to provide information to insurers to place them on notice. Browning testified that the exhibits:

> [C]ontain[] the information that, when I became general counsel, I asked our people to put together relevant to all the asbestos matters, and it's the same information that when I first gave my notice, it's an update of that information through the fourth quarter.
>
> . . . As I believe I said when we first started, I wanted to make sure everybody on the CB&I team, including the lawyers, made sure that the insurance carriers were kept apprised or noticed of what was going on in these asbestos cases[.]

Based on the documents' contents and his own knowledge of the documents' purpose, Browning's testimony establishes that the documents are what they claim to be: information regarding the underlying asbestos claims sent to London for purposes of giving London notice of the claims. *See* Tex. R. Evid. 901(a), (b)(1). The trial court did not abuse its discretion by admitting the exhibits into evidence. *See Living Ctrs. of Tex.,* 175 S.W.3d at 261*; see also Morrison*, 555 F.3d at 483; *Cent. Gulf Lines,* 747 F.2d at 319; *City of Austin*, 844 S.W.2d at 791.

26

We now address London's contention that CB&I failed to provide notice in accordance with London's policies. The purpose of a notice of claim provision in an insurance policy is to afford the insurer the opportunity to conduct a timely and thorough investigation of the insured's claim and the opportunity to locate and participate in the insured's defense. *IMC Global v. Cont'l Ins. Co.*, 883 N.E.2d 68, 78 (Ill. App. Ct. 2007). "Notice is sufficient where the insurer knows both that a cause of action has been filed and that the complaint falls within or potentially falls within the scope of coverage of the insurer's policy." *Vega v. Gore*, 730 N.E.2d 587, 589 (Ill. App. Ct. 2000). "[C]onditions inserted into insurance policies are to be construed most favorably to the insured." *Hartford Accident & Indem. Co. v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 595 N.E.2d 1311, 1315 (Ill. App. Ct. 1992). "The 'appears likely' notice provisions grant the insured greater discretion in deciding whether liability under the policy is *likely*, not just possible." *Id*. at 1317.

In August 2006, CB&I was added as a defendant in the "Bickham litigation," which involved claims arising out of asbestos exposure at the Bogalusa Mill. In May 2007, CB&I provided London with an omnibus submission identifying the Bickham litigation. In 2008, 2009, and 2010, CB&I provided additional omnibus submissions. CB&I sent these submissions as "continuing

27

notice" of the asbestos claims. London contends that these submissions were insufficient notice to both Certain Underwriters and Certain London Market Insurance Companies because the "Companies" were not "subscribers to any Direct Reporting Agreement." London further contends that only the 2009 submission indicated that the Bogalusa Mill claims would constitute a covered occurrence and that by 2009, CB&I had already entered large settlements with the claimants without notice to London.

The record indicates that Certain Underwriters and Certain London Market Insurance Companies shared legal representation when they received the May 2007 submission. Additionally, Browning testified that it would be reasonable for CB&I to provide notice to London's counsel and that the law firm associated with the direct reporting agreement had merged with the firm representing London. The "appears likely" language in the notice provision gave CB&I greater discretion when deciding whether liability under London's policies was likely. *See Hartford*, 595 N.E.2d at 1317. Moreover, the notice provision does not require the inclusion of any particular information. *See Nicor*, 860 N.E.2d at 286. The submissions contained information such as the number of claimants, type of claim, jurisdiction, date of service, closure date if applicable, status of case, defense costs, and settlement amount where applicable. With respect to the Bickham litigation, the

28

number of plaintiffs alone suggests that the complaints against CB&I potentially fell within the scope of coverage. At the very least, the submissions placed London on notice that a cause of action had been filed against its insured and that the complaints against CB&I potentially fell within the policy's scope of coverage. *See IMC Global*, 883 N.E.2d at 78; *see also Vega*, 730 N.E.2d at 589. The trial court properly found that London's defense based on an alleged breach of the notice provision failed as a matter of law. We overrule issue six.

Compliance with Definite Claim Provision

In issue seven, London argues that the trial court erroneously granted a directed verdict on London's defense to coverage based on an alleged breach of the "Definite Claim" provision in the policy. London's "loss payable" clause states, in pertinent part:

> The Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters.

In its motion for directed verdict, CB&I argued that London (1) waived the right to assert a definite claim defense, (2) failed to establish breach of the provision, and (3) failed to establish prejudice as the result of any breach. The trial court granted

CB&I's motion and held that London's defense failed as a matter of law. On appeal, London argues that the definite claim provision is an enforceable contractual statute of limitations. CB&I likens the "loss payable" provision to a proof of loss provision and argues that London "can waive, or be equitably estopped from asserting, the definite claim defense if they issue a general denial of coverage before CB&I's duty to submit a definite claim is triggered."

Illinois law recognizes contractual limitations periods. *See Medrano v. Prod. Eng'g Co.*, 774 N.E.2d 371, 378 (Ill. App. Ct. 2002). Illinois law also recognizes that "an insurer should not be allowed to assert a blanket denial of coverage and then assert the insured's failure to provide proof of loss, since the law does not require the insured to perform what appeared to be a useless act." *Owners Ins. Co. v. Seamless Gutter Corp.*, 960 N.E.2d 1260, 1271 (Ill. App. Ct. 2011). Policy provisions as to proof of loss may be waived by the insurer "by means of conduct which would lead the insured to believe the company did not intend to require compliance with the terms of the policy as to the furnishing of proof and ascertainment of loss." *Di Leo v. U.S. Fid. & Guar. Co.*, 200 N.E.2d 405, 410-11 (Ill. App. Ct. 1964). The denial of liability, based on grounds other than the insured's failure to furnish due notice and proof of loss, ordinarily constitutes a

30

waiver or estoppel by the insurer to insist on compliance with proof of loss requirements. *Id.* at 411.

Our research does not reveal an Illinois case likening a proof of loss provision to a definite claim provision. However, in *Chicago Bridge*, London challenged the trial court's findings that London waived compliance with the condition requiring CB&I to "'make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve . . . months after the Assured shall have paid an amount of ultimate net loss in excess of the [\$ 100,000 SIR].'" *Chicago Bridge*, 797 N.E.2d at 446. The trial court had "relied on the principle that an insurer may waive a proof of loss requirement by its conduct[,]" *i.e.*, that CB&I could have reasonably "construed London's initial telexed reply indicating that ALT was not covered by the policies, and then London's 'entire subsequent course of conduct in response to [CB&I's] coverage claims' as a denial of coverage." *Id.* The Massachusetts Appellate Court upheld the trial court's ruling that compliance with the above condition was not required. *Id.* at 446-47. In *Liberty Mutual Insurance Company v. Those Certain Underwriters at Lloyds*, 650 F. Supp. 1553 (W.D. Pa. 1987), the policy's "loss payable" provision stated:

> [t]he assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the

31

Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters.

*Liberty Mutual*, 650 F. Supp. at 1556. The federal court explained that "employing the Underwriter[s'] analogy to proof of loss provisions, where an insurer denies coverage on other grounds before expiration of the time allowed for proof of loss, the requirement of proof of loss becomes a useless gesture and is therefore deemed to be waived." *Id*. at 1557. The Court held that the law applicable to proof of loss provisions is equally applicable to definite claim provisions. *Id*. We agree that, as with proof of loss claims, it would serve no purpose for an insured to file a definite claim when the insurer has denied coverage. *See Owners Ins. Co.*, 960 N.E.2d at 1271; *see also Di Leo*, 200 N.E.2d at 410-11; *Chicago Bridge*, 797 N.E.2d at 446-47; *Liberty Mutual*, 650 F. Supp. at 1557.

In March 2007, London entered a general denial, and London also specifically denied that CB&I was entitled to any relief and alleged several defenses to coverage. Subsequently, CB&I settled with numerous claimants. CB&I presented evidence that London did not respond to CB&I's omnibus submissions or participate in the underlying asbestos cases. Browning testified that he understood London's general denial as stating that London had no liability whatsoever. London's denial of coverage and its course of conduct could lead

CB&I to believe London did not intend to require compliance with the definite claim provision. *See Di Leo*, 200 N.E.2d at 410-11; *see also Chicago Bridge*, 797 N.E.2d at 446. London cannot now require CB&I to comply with the definite claim provision. *See Owners Ins. Co.*, 960 N.E.2d at 1271; *see also Di Leo*, 200 N.E.2d at 411; *Liberty Mutual*, 650 F. Supp. at 1557. Because the trial court did not err by determining that London's definite claim defense failed as a matter of law, we overrule issue seven. Having overruled London's seven issues on appeal and CB&I's sole issue on cross-appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on April 4, 2013
Opinion Delivered June 27, 2013
Before McKeithen, C.J., Gaultney and Kreger, JJ.